51 Cal.Rptr.3d 741 (2006)
145 Cal.App.4th 495
Lee Max BARNETT, Petitioner,
v.
The SUPERIOR COURT of Butte County, Respondent;
The People, Real Party in Interest.
No. C051311.
Court of Appeal of California, Third District.
December 5, 2006.
*747 Daniel J. Broderick, Acting Federal Defender, Jennifer M. Corey, Assistant Federal Defender; Robert D. Bacon, for Petitioner.
No appearance for Respondent.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Senior Assistant Attorney General, Ward A. Campbell, Supervising Deputy Attorney General, Erie L. Christoffersen, Deputy Attorney General, for Real Party in Interest.
ROBIE, J.
Penal Code [1] section 1054.9 allows persons subject to a sentence of death or life in prison without the possibility of parole to file a motion for postconviction discovery to assist in seeking a writ of habeas corpus or an order vacating the judgment. In In re Steele (2004) 32 Cal.4th 682, 10 Cal.Rptr.3d 536, 85 P.3d 444, the California Supreme Court resolved a number of "important procedural and substantive issues regarding that section," (id. at p. 688, 10 Cal.Rptr.3d 536, 85 P.3d 444) but the court left many other issues unresolved.
Here, we have occasion to continue the work begun in Steele. In 2004, shortly after the publication of Steele, petitioner Lee Max Barnett filed a comprehensive motion for discovery under section 1054.9 in Butte County Superior Court. Ultimately, the court granted many of Barnett's requests but denied many others. Barnett brought this writ proceeding to challenge the denials.
As will be shown, we conclude the trial court did not abuse its discretion in denying most of Barnett's requests but did abuse its discretion in denying some, and therefore we will grant Barnett's petition in part and deny it in part. In reaching that result, we conclude (among other things) that: (1) the Legislature did not intend to require a defendant seeking discovery under section 1054.9 to prove the actual existence (or a good faith belief in the actual existence) of materials in the possession of the prosecution and/or the relevant law enforcement authorities before the court can order discovery under the statute; (2) in requesting materials pursuant to section 1054.9, a defendant does not have to provide the People with an inventory of every single document or other item the defendant possesses already; (3) section 1054.9 does not give a defendant the right to have the court order duplicative discovery; (4) section 1054.9 does not provide a vehicle for a defendant to enforce any obligation the People may have to produce exculpatory evidence they did not possess at time of trial; and (5) an unsworn denial of the existence of any further responsive documents is not a valid basis for upholding the denial of a defendant's motion for discovery under section 1054.9.

FACTUAL AND PROCEDURAL BACKGROUND
In 1988 in Butte County, Barnett was convicted of the murder of Richard Eggett (as well as other crimes) and sentenced to death. In 1998, the California Supreme Court affirmed his convictions and sentence. (People v. Barnett (1998) 17 Cal.4th 1044, 1075, 1104, 1183, 74 Cal. Rptr.2d 121, 954 P.2d 384.)
*748 In July 2004, Barnett filed a discovery motion pursuant to section 1054.9.[2] At the time, he had two petitions for habeas corpus pending in the California Supreme Court and one pending in federal court.[3]
In his discovery motion, Barnett sought various materials, including materials now missing from the numbered discovery provided during trial, materials the prosecution allegedly failed to produce in response to a discovery order during trial, and various other materials.
At a hearing on the motion in November 2004, in front of the same judge who had served as the trial judge 16 years earlier, the prosecutor told the court the parties had been working together outside of court to narrow the issues. Barnett's counsel agreed they had "made a lot of progress," but both sides acknowledged there would be areas of disagreement. Ultimately, the parties agreed to meet and confer on a proposed briefing schedule to address those areas of disagreement.
In December 2004, the court entered an order setting a briefing schedule to address "each specific item remaining at issue" and setting a further hearing for March 2005. Pursuant to the briefing schedule, Barnett filed a supplemental brief that identified 60 different items or categories of items that he was seeking to discover.
The People were to file their brief in January 2005, but failed to do so. In February, pursuant to the ordered briefing schedule, Barnett filed his reply brief asking the court to "grant discovery of all items requested in the amended discovery motion" due to the People's failure to file their brief.
At the hearing in March, the prosecutor apologized for failing to file his brief and said he would "like to try another round of informal [discussion with apposing counsel] before we involve the Court." Barnett's counsel agreed.
At a status conference in April, at the request of Barnett's counsel, the court ordered the People to produce by May 12 everything they were going to agree to produce. The parties and the court would then address "any areas of disagreement" at another status conference already set for July.
At the July status conference, Barnett's counsel acknowledged that the People had produced over 300 pages of discovery materials and 64 compact discs of audio tape recordings. Ultimately, it was agreed Barnett would file a further supplemental brief in August, with the People's response to follow in September.
In their response, the People argued, among other things, that: (1) "in requesting materials pursuant to section 1054.9, a petitioner must show that the requested *749 materials are not in his possession"; (2) to be entitled to an order for the production of documents, the prosecution was required, but failed, to disclose at trial, "a petitioner must overcome a presumption that the prosecution properly fulfilled its discovery obligations at trial"; and (3) to succeed on a motion under section 1054.9, "a petitioner must establish a good faith basis to believe the materials requested actually exist." The People also specifically responded to many of Barnett's discovery requests by noting that "[n]othing exists as to this request beyond that already disclosed to petitioner."
A further hearing on the discovery motion was held in October 2005, and in November the trial court issued its ruling, granting some requests and denying others. As to the requests the trial court granted, the court ordered that "if there [are] no discovery materials or no further discovery materials to be provided beyond what has already been provided, then the [People] should so state in a written declaration to be provided petitioner-defendant on or before the discovery deadline. [¶] The declaration should state the factual basis for the conclusion, quote, nothing exists to be discovered as to this item of discovery, end quote; or, quote, nothing exists as to the discovery item beyond what has already been provided, end quote, [¶] The declaration should address what efforts were made to find the item or items of discovery, including what, if any, agencies or individuals were contacted and their responses."
As to the requests the trial court denied, the court did not offer a separate reason for its ruling as to each request, but stated only that it was doing so "because I find that particular request falls outside the guidelines set forth in the Steele decision."
On November 30, 2005, Barnett commenced this proceeding by filing a petition for writ of mandate in this court seeking to compel the trial court to grant the various discovery requests it had denied. We ordered the issuance of an alternative writ of mandate.

DISCUSSION
At issue in this proceeding is the trial court's denial, in whole or in part, of 24 different discovery requests.[4] We will address each of those requests separately.

I

Home Addresses Of Law Enforcement Witnesses
In February 1987, on a motion by Barnett to compel discovery, the trial court ordered the People to make available to Barnett "[t]he names, addresses and telephone numbers of all witnesses, prepared in a written list, who may be called to testify by the prosecution at any hearing or phase of the trial in this case, including but not limited to the guilt trial and penalty phase."
In his motion for discovery under section 1054.9, Barnett asserted that "[t]he state never provided such a list." Barnett claimed "[t]he district attorney did provide a list of potential witnesses ..., but many of the witnesses who testified at trial are not on the list." Barnett requested "a complete and accurate witness list as was ordered in the trial court's discovery order."
The People asserted they had "no memory or documentation that such a specific list was given other than a partial subpoena list used for internal purposes." The *750 People did, however, "attempt[ ] to reconstruct the missing witness list with other information that existed in the People's files from the trial," but did not include in that list the home addresses of any law enforcement officers who testified. According to the People, the "home addresses of police ... witnesses ... were not reconstructed" because "a peace officer's home address is not to be disclosed."
The trial court ordered the People to provide the requested witness list, with the exception that "[n]o home addresses or telephone numbers of law enforcement officers are required to be disclosed."
Barnett contends the trial court erred in refusing to order the People to disclose the home addresses of the 15 law enforcement officers who testified at trial. He contends the home addresses of the law enforcement witnesses were relevant for impeachment purposes because "[a] credibility investigation includes an inquiry into the witnesses' reputation in their home communities" and denying him those addresses deprived him of various constitutional rights, including his Sixth Amendment right to confrontation.
In People v. Lewis (1982) 133 Cal.App.3d 317,184 Cal.Rptr. 31, a defendant who was charged with possession of phencyclidine (PCP) for sale "brought a discovery motion seeking to obtain ... the home addresses of the two arresting officers." (Id. at p. 319,184 Cal.Rptr. 31.) "The stated reason for the request was that, since appellant and the officers had different versions of the events leading up to appellant's arrest, and appellant's counsel had `reason to believe' that the officers' version was untrue, the officers' credibility was a crucial issue in the case and the defense should be allowed to investigate their reputations within their home communities for possible impeachment purposes." (Id. at p. 321, 184 Cal.Rptr. 31.)
The trial court denied the motion, and the appellate court affirmed that ruling. (People v. Lewis, supra, 133 Cal.App.3d at p. 321, 184 Cal.Rptr. 31.) The appellate court explained that "[t]he constitutionally guaranteed right to confront witnesses is not without limitations. One such limitation is where the disclosure of certain information about the witness, such as his residence address, would endanger the witness or his family. In California, the Legislature has seen fit to include peace officers within this protected group by enacting Penal Code section 1328.5, which provides: `Whenever any peace officer is a witness before any court or magistrate in any criminal action or proceeding in connection with a matter regarding an event or transaction which he has perceived or investigated in the course of his duties, where his testimony would become a matter of public record, and where he is required to state the place of his residence, he need not state the place of his residence, but in lieu thereof, he may state his business address.' [¶] This case presents the type of situation visualized by the Legislature when it enacted section 1328.5. It is not uncommon for criminal defendants and law enforcement officers to relate different versions of the events leading up to the defendant's arrest. The Legislature recognized the potential danger to which law enforcement officers and their families could be exposed if the officers were required to disclose their home addresses during the course of testimony, making such information available to discontented defendants and their associates. [¶] ... [Disclosure of the officers' home addresses without their authorization is specifically foreclosed by section 1328.5." (People v. Lewis, supra, 133 Cal.App.3d at pp. 321-322,184 Cal.Rptr. 31, fns. omitted.)
Barnett contends we are "not bound by Lewis" because "Lewis did not discuss alternatives *751 that would have provided the information to defense counsel, but not the defendant, such as a protective order" and because "Lewis was decided prior to the enactment of ... Penal Code section 1054.2(a)(1) [in 1990, which] requires defense counsel to keep confidential addresses and telephone numbers of witnesses, and not provide that information to the defendant or any other person." Barnett further contends that section 1054.2, subdivision (a)(1), and section 1328.5 "can be harmonized to allow disclosure of peace officers' home addresses to defense counsel in discovery subject to § 1054.2(a)(1), as opposed to in open court." Accordingly, Barnett concludes we have "discretion to grant [his] request" for the home addresses of the law enforcement witnesses.
Barnett's argument misapprehends both our role in this proceeding and the scope of discovery permitted by section 1054.9. First of all, it is not for us, as a reviewing court, to exercise our discretion in determining whether to grant or deny Barnett's request for discovery of particular materials. Our role is to review the ruling of the trial court, and (as Barnett admits elsewhere in his petition) an appellate court "generally review[s] a trial court's ruling on matters regarding discovery under an abuse of discretion standard." (People v. Ayala (2000) 23 Cal.4th 225, 299, 96 Cal. Rptr.2d 682, 1 P.3d 3.) Thus, the question for us is whether the trial court abused its discretion in denying Barnett's request for the home addresses of the law enforcement witnesses.
This leads us to Barnett's misapprehension of the scope of discovery permitted by section 1054.9. The statute specifically allows a defendant to seek discovery of materials "to which [he] would have been entitled at time of trial." (§ 1054.9, subd. (b).) As our Supreme Court explained in Steele, while this language is broad enough to make section 1054.9 more than just "a `file reconstruction statute,'" at the same time the statutory language "does not allow `free-floating' discovery asking for virtually anything the prosecution possesses." (In re Steele, supra, 32 Cal.4th at pp. 693, 695, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Instead, section 1054.9 "provide[s] only limited discovery"; specifically, "the statute is limited to materials to which the defendant would have been entitled at the time of trial." (In re Steele, supra, 32 Cal.4th at p. 695, 10 Cal.Rptr.3d 536, 85 P.3d 444.)
In Steele, the Supreme Court explained that those materials include "materials the prosecution provided at trial but that the defendant can show have since been lost,"[5] as well as "materials to which the defendant was actually entitled at time of trial, but did not receive." (In re Steele, supra, 32 Cal.4th at p. 695, 10 Cal.Rptr.3d 536, 85 P.3d 444.) The court further explained that this latter category of materials could be further broken down into three subcategories: (1) "specific materials that the defendant can show the prosecution should have provided (but did not provide) at the time of trial because they came within the scope of a discovery order the trial court actually issued at time of trial or a statutory duty to provide discovery" "or the constitutional duty to disclose exculpatory evidence"; (2) "materials the prosecution should have provided at the time of trial because the defense specifically requested them at that time and was entitled to receive them"; and (3) "materials that the prosecution would have been obligated to provide had there been a specific defense request at trial, but was not actually obligated to provide because no such request *752 was made."[6] (Id. at pp. 695, 697, 10 Cal. Rptr.3d 536, 85 P.3d 444.)
With this understanding of what materials are discoverable under section 1054.9, the question for us is whether the trial court abused its discretion in determining that the home addresses of the law enforcement witnesses did not fall within any of the foregoing categories of materials to which Barnett would have been entitled at time of trial. Of course, since it is Barnett's burden to demonstrate an abuse of discretion by the trial court (see Denham v. Superior Court (1970) 2 Cal.3d 557, 566, 86 Cal.Rptr. 65, 468 P.2d 193), it falls to him to convince us that the material he seeks is something to which he would have been entitled at trial.
Here, Barnett contended in the trial court that the home addresses of the law enforcement witnesses were category No. 2 materials because they came within the scope of the discovery order the trial court issued in February 1987. The trial court implicitly concluded that the home addresses did not fall within this category, and the question for us is whether the trial court abused its discretion in making that determination.
We find no abuse of discretion. It is not clear from the face of the discovery order that the trial court intended to require the prosecution to disclose the material Barnett sought. The order directed the prosecution to make available to Barnett "[t]he ... addresses ... of all witnesses ... who may be called to testify by the prosecution." While the order was certainly broad enough to encompass any law enforcement witnesses, the reference to "addresses"unqualified by the word "home"makes it uncertain whether the trial court intended to require the disclosure of the home addressesrather than the work addressesof any law enforcement witnesses.
Because we draw all presumptions in favor of the trial court's order (see Benham v. Superior Court, supra, 2 Cal.3d at p. 566, 86 Cal.Rptr. 65, 468 P.2d 193), we presume that the trial court concluded disclosure of the home addresses of the law enforcement witnesses was not within the intended scope of the discovery order. This conclusion is reasonable for at least two reasons. First, because the judge ruling on the section 1054.9 motion was the same judge who issued the discovery order, he is the person most likely to know what the intended scope of the discovery order was. Second, at the time the trial court made the discovery order, Lewis had been the law for nearly five years. Lewis specifically held that "disclosure of the officers' home addresses without their authorization is specifically foreclosed by section 1328.5." (People v. Lewis, supra, 133 Cal. App.3d at p. 322, 184 Cal.Rptr. 31.) Since the trial court was bound by Lewis (see Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937), it is eminently reasonable to conclude that in ordering the disclosure of the "addresses" of all witnesses, the trial court did not intend to require the disclosure of the home addresses of those witnesses who were law enforcement officers, because Lewis prohibited the court from making such an order.
Accordingly, the trial court did not abuse its discretion in determining the home addresses of the law enforcement witnesses were not within the scope of the discovery order and therefore were not material to which defendant would have *753 been entitled at time of trial. To the extent Barnett asks us to determine whether Lewis was wrongly decided, or to revisit Lewis in light of the enactment of section 1054.2, we have no power to do so in this proceeding. As Barnett admits elsewhere in his petition, "[t]he law in effect at the time of his pre-trial and trial proceedings governs this Court's determination of what Mr. Barnett was entitled to receive in discovery." In 1987, Lewis was the law (and it remains the law today). Under Lewis, Barnett was not entitled to the home addresses of the law enforcement witnesses. Therefore, he is not entitled to that material now on a motion under section 1054.9, and thus the trial court did not abuse its discretion in denying this aspect of his motion.

II

Original Notes By Out-Of-State Law Enforcement Officers
In its February 1987 discovery order, the trial court granted Barnett's request for "[a]ll original notes taken by any police officer relating to the interview of any witness to be called to testify against the defendant."
In his motion for discovery under section 1054.9, Barnett asserted that "[n]o original notes of any witness interview were provided in discovery." Accordingly, Barnett requested "discovery of all notes taken by any law enforcement officer relating to the interview of any witness." (We will sometimes refer to this request as discovery item No. 6.)
In their informal response to this request, the district attorney (Michael Ramsey) and the chief investigator for the district attorney's office (Tony Koester) "reviewed all of the files in [their] possession relating to the Barnett case and ... discovered a number of sheets of notes which appear[ed] to be interview notes of witnesses." The People provided these notes to Barnett.
Barnett asserted that this response was "insufficient" because the People had "made no representation that they ha[d] asked [14 in-state law enforcement] officers [who were involved in witness interviews] for any original notes." Barnett asked the court to order the People to contact these officers "to ascertain whether any officer maintained original notes of the interviews in question." Barnett also asked the court to order the People to contact, for the same purpose, 22 out-of-state law enforcement officers who conducted interviews of witnesses who testified at trial.[7]
In their formal response, the People asserted that "[n]o notes of investigative officers were ever part of the discovery shared with trial defense counsel because none existed nor was there a duty to preserve." The People then clarified that "the `prosecution team' never had those notes" and argued that they should not have "to go on an expedition to hunt for other agencies' officers' notes ... that may have been created during the investigations of the petitioner's other decades' old crimes."
At the outset of its order on the section 1054.9 motion, the trial court made a ruling about which law enforcement agencies qualified as "law enforcement authorities" for purposes of section 1054.9 under the Supreme Court's decision in Steele. Recall that under subdivision (b) of the statute, the "discovery materials" to which the *754 People must provide the defendant access are limited to "materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial." In Steele, the Supreme Court explained that the term "law enforcement authorities" did "not extend to all law enforcement authorities everywhere in the world, but ... only to law enforcement authorities who were involved in the investigation or prosecution of the case." (In re Steele, supra, 32 Cal.4th at p. 696, 10 Cal.Rptr.3d 536, 85 P.3d 444.)
The trial court here extrapolated from the Supreme Court's language that the term "law enforcement authorities" included "any law enforcement agency involved in the investigation of any criminal conduct, be it a charged or uncharged crime that was presented against Mr. Barnett in the guilt phase or as an aggravating factor in the penalty phase of the case." The court referred to this ruling as "Point One."
Subsequently, in ruling on Barnett's motion for police notes of witness interviews (discovery item No. 6), the court ordered the People "to contact the agencies listed that meet the criterion recited in Point One, to ascertain if their case file or agency records currently contain any of the requested "materials." In making this order, however, the court limited its)ruling to the 14 in-state law enforcement officers Barnett had identified and did not include the 22 out-of-state officers.[8]
Barnett contends the trial court's refusal to order the production of interview notes from the out-of-state law enforcement officers "is contrary to Steele" because those officers "all were involved in the investigation and prosecution of the case against him." The People offer three responses to this argument, which we will address in turn.

A

Law Enforcement Authorities
We begin with the People's argument that "Barnett has interpreted the term `law enforcement' in section 1054.9 much too broadly." According to the People, law enforcement agencies are "involved *755 in the investigation and prosecution of the case" within the meaning of Steele only if those agencies can be deemed "part of the prosecution team at trial," only if they were "involved in the investigation and prosecution of the capital murder charged in this case," and only if they "work[ed] for or acted as an agency of the prosecutor in this case." The People further contend that "[j]ust because a law enforcement agency provides information about earlier criminal conduct of a defendant, unrelated to the charged offense that is the basis for the current trial, does not render that agency part of the prosecution team."
We believe it is not Barnett who has interpreted the statute too broadly, but the People who have interpreted it too narrowly. Barnett asserted in support of his motion that the 22 out-of-state law enforcement officers "conducted interviews of witnesses who testified at trial," and the People did not (and do not) dispute that assertion. Elsewhere in his moving papers, Barnett asserted that the People had provided in the original trial discovery the reports of those (and other) interviews; thus, it is apparent that the People obtained the reports of the interviews from the out-of-state law enforcement agencies for the purpose of preparing the capital case against Barnett.
The question, then, is whether a law enforcement agency that provides a report relating to previous criminal conduct by a defendant charged with a capital offense can be deemed to have been "involved in the investigation or prosecution of the case" against the defendant, such that materials in the possession of that agency are subject to discovery under section 1054.9. We conclude the answer to that question is "yes."
In Steele, the Supreme Court stated that the law enforcement agencies that are excluded from the reach of section 1054.9 are those "that were not involved in the investigating or preparing of the case against the defendant." (In re Steele, supra, 32 Cal.4th at p. 696, 10 Cal.Rptr.3d 536, 85 P.3d 444.) A capital case like this frequently encompasses investigation and proof of prior felony convictions the defendant has suffered because the jury may consider such convictions in determining whether to impose the death penalty or life without the possibility of parole. (People v. Gurule (2002) 28 Cal.4th 557, 636, 123 Cal.Rptr.2d 345, 51 P.3d 224; § 190.3, subd. (c).) Thus, the investigation of prior felony convictions, and preparation of the evidence necessary to prove those convictions, is a standard part of the prosecution of a capital case. To the extent the out-of-state law enforcement agencies here provided the People, during their preparation of the capital case against Barnett, with reports of his prior criminal conduct that resulted in felony convictions, those agencies were without question "involved in the investigating [and] preparing of the case against" Barnett. That their involvement may have been limited to providing reports the People requested from them does not change the fact that they were "involved."
Citing Moon v. Head (11th Cir.2002) 285 F.3d 1301, the People argue that a law enforcement agency that merely provides information about earlier criminal conduct "does not render that agency part of the prosecution team." The implied point of this argument is that a law enforcement agency must be "part of the prosecution team" in order to be deemed "involved in the investigation or prosecution of the case" within the meaning of Steele. We disagree.
This argument arises from that part of Steele in which our Supreme Court concluded that limiting the term "law enforcement authorities" in section 1054.9 to *756 agencies "involved in the investigation or prosecution of the case" was "consistent with the scope of the prosecution's constitutional duty to disclose exculpatory information." (In re Steele, supra, 32 Cal.4th at p. 696, 10 Cal.Rptr.3d 536, 85 P.3d 444.) According to the court, under case law from the United States Supreme Court, "the prosecution is responsible not only for evidence in its own files but also for information possessed by others acting on the government's behalf that were gathered in connection with the investigation." (Id. at p. 697, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Thus, by interpreting the term "law enforcement authorities" in section 1054.9 to mean agencies "involved in the investigation or prosecution of the case," our Supreme Court sought to establish parity between the prosecution's constitutional duty to disclose exculpatory information and the availability of discovery under section 1054.9.
In Moon, a case that involved the constitutional duty to disclose exculpatory information, the Eleventh Circuit held that that duty did not extend to information in the possession of an out-of-state law enforcement agency because that agency was not part of the "prosecution team." (Moon v. Head, supra, 285 F.3d at pp. 1309-1310.) Relying on Moon, and the parity our Supreme Court established in Steele, the People here reason that because the out-of-state law enforcement agencies at issue here were not part of the "prosecution team" for purposes of the constitutional duty to disclose exculpatory information, they likewise do not qualify as "law enforcement authorities" within the meaning of section 1054.9.
The People's reliance on Moon is misplaced. Unlike the Eleventh Circuit, California courts do not interpret the constitutional duty to disclose exculpatory information as limited to information in the actual possession of the "prosecution team." Instead, as explained in People v. Superior Court (Barrett) (2000) 80 Cal. App.4th 1305, 96 Cal.Rptr.2d 264 (which our Supreme Court cited with approval in Steele, supra, 32 Cal.4th at p.. 697, 10 Cal.Rptr.3d 536, 85 P.3d 444), prosecutor's duty under Brady [v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, [10 L.Ed.2d 215]] to disclose material exculpatory evidence extends to evidence the prosecutoror the prosecution team knowingly possesses or has the right to possess.... In Kyles v. Whitley (1995) 514 U.S. 419, 437-438 [115 S.Ct. 1555, 1567, 131 L.Ed.2d 490], the Supreme Court held that a prosecutor has a duty to learn of favorable evidence known to other prosecutorial and investigative agencies acting on the prosecution's behalf, including police agencies. The scope of the prosecutorial duty to disclose encompasses exculpatory evidence possessed by investigative agencies to which the prosecutor has reasonable access. [Citation.] [¶] A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work. The important determinant is whether the person or agency has been `acting on the government's behalf [citation] or `assisting the government's case.' [Citation.] [¶] Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information. Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." (People v. Superior *757 Court (Barrett), supra, 80 Cal.App.4th at pp. 1314-1315, 96 Cal.Rptr.2d 264.)
Here, even if the out-of-state law enforcement agencies were not part of the "prosecution team," the People used those agencies to assist in their prosecution of the capital case against Barnett. Accordingly, the People had constructive possession of information possessed by those agencies, and the People's constitutional duty to disclose exculpatory information extended to information in the possession of those agencies. It follows then that those agencies were "involved in the investigation or prosecution of the case" against Barnett within the meaning of Steele. Consequently, the People cannot avoid their duty of disclosure under section 1054.9 by claiming otherwise.

B

Actual Existence Of Discovery Materials
This leads us to the People's next argument in defense of the trial court's denial of Barnett's request for discovery of interview notes from the out-of-state law enforcement officers. The People argue that "Barnett has not made the necessary showing that he was unsuccessful in obtaining these materials, to the extent they exist, from trial counsel." The People concede that "Barnett exercised good faith efforts to obtain discovery material from trial counsel. Indeed, the record indicates that Barnett received trial counsel's entire file." Nevertheless, the People contend "Barnett has never made the necessary showing that his efforts at obtaining discovery materials were `unsuccessful.' To make such a showing, Barnett must establish that some discovery materials actually exist beyond those obtained from trial counsel. Unless additional discovery materials are shown to exist, there is no basis to conclude that Barnett was unsuccessful in obtaining the discovery materials defined by section 1054.9."
As applied to the documents presently at issue, the People's argument would mean that before Barnett is entitled to discovery under section 1054.9 of the original police notes to which he sought access, he must prove that those notes actually exist. As we will explain, we find no basis for any such requirement in section 1054.9 or in Steele.
As an initial matter, however, we address Barnett's argument that this issue is not properly before us. We previously explained that with respect to the discovery requests the trial court denied, the court stated that it was doing so because it found those requests fell "outside the guidelines set forth in the Steele decision." According to Barnett, since those "guidelines" did not include a requirement that the defendant show the materials sought actually exist (because that issue was not tendered to the Steele court), "[t]he Superior Court did not require Mr. Barnett to show that the materials he sought existed." In Barnett's view, the People's attempt to raise the "existence" issue now is a challenge to this aspect of the trial court's ruling, which is barred because the People did not file their own petition for a writ of mandate.
We are not persuaded. As an appellate court, "we review the correctness of the trial court's ruling, not the reasons underlying it." (People v. Koontz (2002) 27 Cal.4th 1041, 1075, fn. 4, 119 Cal. Rptr.2d 859, 46 P.3d 335.) "A judgment or order correct in theory will be affirmed, even where the trial court's given reasoning is erroneous." (Punsly v. Ho (2003) 105 Cal.App.4th 102, 113, 129 Cal.Rptr.2d 89.) What that means here is that the question before us is whether the trial court abused its discretion in denying Barnett's request for the original notes of the *758 out-of-state law enforcement officers, whatever the trial court's reason may have been for its ruling. If we determine the denial of that request was the correct result because Barnett did not make a foundational showing of the existence of the requested documents, we will uphold the trial court's ruling, even if that is not the reason the trial court gave for doing what it did. Accordingly, we proceed to consider the validity of the People's argument.
Although the People purport to premise their argument on the word "unsuccessful," a careful examination of the argument reveals that it actually rests more substantially on the definition of "discovery materials" contained in subdivision (b) of section 1054.9. Subdivision (b) expressly defines "discovery materials" as "materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial." As the Supreme Court explained in Steele, this definition encompasses only those materials "in their possession currently." (In re Steele, supra, 32 Cal.4th at p. 695,10 Cal.Rptr.3d 536, 85 P.3d 444.) According to the People, under this definition "a finite set of [discovery] materials actually exists for every case" specifically, those materials to which the defendant would have been entitled at time of trial that are currently in the possession of the prosecution or of a law enforcement authority that was involved in the investigation or prosecution of the case.
Under subdivision (a) of the statute, a fundamental prerequisite to obtaining a discovery order is "a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful." (§ 1054.9, subd. (a), italics added.) By the People's reasoning, a defendant cannot establish the requisite lack of success "[u]nless [he] establishes that some materials from th[e] finite universe [of `discovery materials'] were missing from trial counsel's files." In other words, the defendant must prove that the material he is seeking is "discovery material" in the first place by proving not only that the material is something to which he would have been entitled at time of trial, but also that the material is currently "in the possession of the prosecution and law enforcement authorities." Under this reasoning, if the material does not exist, then it cannot be "in the possession of the prosecution and law enforcement authorities" and is therefore not "discovery material" subject to discovery under section 1054.9.
Another way of looking at the People's argument is in relation to requests for categories of materialssuch as the request at issue here for interview notes. If a defendant receives some interview notes from trial counsel, but then asks for interview notes again under section 1054.9, he cannot show his effort to get interview notes from trial counsel was "unsuccessful" unless he shows that there are some notes that exist other than those he has received already. If the defendant already received all of the interview notes that exist from trial counsel, then obviously his efforts were successful, rather than unsuccessful.
Accordingly, under the People's reading of the statute, before he can obtain a discovery order under section 1054.9, the defendant must prove that any particular material or category of material to which he seeks access: (1) is something to which he would have been entitled at time of trial; (2) actually exists; (3) is currently in the possession of the prosecution and law enforcement authorities that were involved in the investigation or prosecution of the case; and (4) was not provided to him by trial counsel, despite his good faith efforts to obtain the material from trial counsel.
*759 Although this interpretation of the statute has some superficial appeal, it erects a standard that is virtually impossible, if not absolutely impossible, for a defendant to meet. This is so because a defendant cannot prove what materials actually and currently exist in the possession of the prosecution and/or law enforcement authorities, unless, perhaps, the prosecution or a relevant law enforcement authority revealed its possession of those materials to the defendant immediately before the filing of the section 1054.9 motion. Even then, the defendant cannot prove the requested materials actually exist at the time the court rules on the motion; that is information only the prosecution and/or the law enforcement authorities themselves have until they disclose the materials. If the People's construction of the statute were to prevail, then even the "main focus" of section 1054.9"to permit reconstruction of lost files" (In re Steele, supra, 32 Cal.4th at p. 694, 10 Cal.Rptr.3d 536, 85 P.3d 444)would be virtually impossible for a defendant to achieve, because he could almost never prove what materials he formerly had (even assuming he could specifically identify materials he no longer possesses)[9] are currently in the possession of the prosecution and relevant law enforcement agencies.
"Our obligation is to interpret the statute `to effectuate the purpose of the law.' [Citation.] `[S]tatutes must be construed in a reasonable and common sense manner consistent with their apparent purpose and the legislative intent underlying them one practical, rather than technical, and one promoting a wise policy rather than mischief or absurdity.'" (Weidenfeller v. Star & Garter (1991) 1 Cal.App.4th 1, 5-6, 2 Cal.Rptr.2d 14.)
Here, requiring the defendant to prove what materials actually, currently exist in the possession of the prosecution and/or law enforcement authorities before allowing him access to those materials would defeat the purpose of section 1054.9 by preventing most, if not all, discovery under the statute. Moreover, requiring the defendant to prove the actual existence of the materials he is seeking would be inconsistent with our Supreme Court's decision in Steele. There, the court concluded the defendant was "entitled to discovery of materials within the scope of [his] current request that [he] does not possess but that the prosecution and law enforcement authorities involved in the case currently possess, if any exist." (In re Steele, supra, 32 Cal.4th at p. 689, 10 Cal.Rptr.3d 536, 85 P.3d 444, italics added; see also ibid, at p. 703, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Thus, the Supreme Court did not require proof of the actual existence of the requested materials as a predicate to a discovery order under section 1054.9, and neither can we.
Interestingly, even the People implicitly recognize the nearly impossible burden their interpretation of the statute would impose on a defendant because, although they initially argue for proof the materials "actually exist," their argument later morphswithout explanationinto an argument that a defendant needs to show only "that the requested materials likely exist" or a "good faith basis to believe that the requested materials actually exist," instead of actual existence of the materials. Although a "good faith belief in the existence of or "likelihood of existence" standard might be more workable than an "actual existence" standard, the former standards have no basis in the language of *760 the statute. Based on the statutory definition of "discovery materials," as interpreted in Steele, either the defendant has to show that what he is requesting qualifies as "discovery materials"that is, something currently in the possession of the prosecution or law enforcement authoritiesor he does not. There is simply no basis for us to read into the statute the requirement of showing a "good faith basis" for believing the materials exist, or proof that they "likely" exist.
Irrespective of category No. 1 materialswhich the defendant used to have but does not have anymoreand category No. 4 materialswhich the defendant never had but would have been entitled to if he had asked for themthe People argue that a requirement of proof of the actual existence of categories Nos. 2 and 3 materials is supported by Evidence Code section 664. That statute provides for an evidentiary presumption "that official duty has been regularly performed." According to the People, "when a petitioner seeks discovery under section 1054.9 for materials in ... categories [Nos. 2 and 3, which should have been provided at trial but were not,] the petitioner is necessarily claiming that a discovery violation occurred, else the materials would have been in trial counsel's files." In the People's view, Evidence Code section 664 requires the court to presume that a discovery violation did not occur and places the burden on the defendant to prove that one did occur, which can be accomplished only by proving that materials exist which the prosecution should have turned over at trial but did not.
We begin by noting that when a defendant seeks discovery of materials that should have been provided at trial, he is not necessarily claiming that a discovery violation occurred. Given that a substantial amount of time may pass between a capital trial and the defendant's subsequent request for discovery under section 1054.9 (here, 16 years elapsed, and Barnett's trial counsel died in the interim), it is possible that a defendant seeking discovery under section 1054.9 will simply have no idea whether the materials he obtained from trial counselassuming he obtained any at allamount to all of the materials the prosecution turned over during trial. Absent such knowledge, a request for materials that should have been provided at trial does not imply a discovery violation by the prosecution. For example, a requestlike the one at issue herefor all original notes of police interviews of witnesses who testified at trial, where such materials came within the scope of a discovery order the court made at time of trial, does not imply a discovery violation if the defendant does not know whether what he obtained from trial counsel is every note the prosecution produced at trial. In other words, in a given case, a defendant who requests materials that should have been provided at trial may not know whether he is requesting materials that were provided but then lost (category No. 1 materials) or materials that were never provided (category No. 2 and/or No. 3 materials).
But what if, as here, the defendant asserts in his motion that "[n]o original notes of any witness interview were provided in discovery"? In such a circumstance, the defendant is expressly requesting category No. 2 and/or No. 3 materials, and there are two possible explanations: either no such notes existed or such notes did exist, but the prosecution failed to comply with the court's order to disclose them. In the People's view, in requesting discovery of such materials under section 1054.9, Barnett is necessarily implying that the second explanation is the correct onethat such notes do exist, but the prosecution *761 failed to comply with the court's order to disclose them, i.e., a discovery violation occurred.[10] According to the People, "Evidence Code section 664 should apply when a discovery violation is alleged. Absent evidence `to the contrary, a prosecutor should be presumed to have properly fulfilled all discovery obligations at trial."
There is some support in Steele for the People's argument that Evidence Code section 664 has a bearing on a discovery motion under section 1054.9. In Steele, while arguing that section 1054.9 should be interpreted as "only a `file reconstruction statute,'" the People asserted that any broader interpretation of the statute would make it "redundant of other law" because "prosecutors have a continuing duty to disclose information favorable to the defense, and we expect and assume that they will perform this duty promptly and fully, and, moreover, ... `[i]t is presumed that official duty has been regularly performed.' (Evid.Code, § 664.)" (In re Steele, supra, 32 Cal.4th at pp. 693-694, 10 Cal.Rptr.3d 536, 85 P.3d 444.) The Steele court rejected this argument as a basis for interpreting the statute, noting that "[n]one of this changes the plain meaning of the statute's inclusion of materials to which the defendant Svould have been entitled.'" (Id. at p. 694, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Before doing so, however, the court made this observation: "the expectation and assumption [that prosecutors will promptly and fully disclose information favorable to the defense] merely mean that normally, and unless the defendant overcomes Evidence Code section 664's presumption as to specific evidence, there will be no discovery for the trial court to order that the prosecutor should have provided at trial." (Ibid.)
Of course, this passage from Steele is dictum because the court there was addressing whether section 1054.9 should be interpreted as only a file reconstruction statute, not what must be shown by a defendant to prevail on a section 1054.9 motion when the materials sought are something the prosecutor should have provided at time of trial. Indeed, the court in Steele ultimately determined that, with respect to the materials at issue there (materials regarding the defendant's behavior in prison), it did "not matter for purposes of discovery under section 1054.9" whether the defendant requested those materials at time of trial, because even if he did not request it he "would have been entitled [to the materials] at time of trial had he specifically requested [them]." (In re Steele, supra, 32 Cal.4th at p. 702, 10 Cal.Rptr.3d 536, 85 P.3d 444.) What this means is that the Supreme Court ultimately treated the materials at issue in Steele as category No. 4 materials. Consequently, the Steele court had no occasion to determine what showing a defendant must make when the materials sought fall in category No. 2 and/or No. 3, and the court's statement about the operation of Evidence Code section 664 in those instances is dictum.
Although we are not bound by dictum from our Supreme Court (State of California v. Superior Court (2000) 78 Cal. App.4th 1019, 1029, 93 Cal.Rptr.2d 276), "When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed." (Hubbard v. Superior Court (1997) 66 Cal.App.4th 1163, 1169, 78 Cal.Rptr.2d 819.) Here, it does not appear from the opinion in Steele that the Supreme Court's brief statement about Evidence Code section 664's application to *762 discovery motions under section 1054.9 was based on such an analysis of the issue. Accordingly, we will now consider whether the official duty presumption of Evidence Code section 664 has any bearing on a motion for discovery under section 1054.9.
"A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action." (Evid.Code, § 600, subd. (a).) The official duty presumption is a presumption affecting the burden of proof. (Evid.Code, § 660.) A presumption affecting the burden of proof "impose[s] upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid.Code, § 606.)
In the People's view, a defendant's request in a motion under section 1054.9 for materials that should have been provided at time of trial triggers the presumption in Evidence Code section 664, requiring the court to assume, as a matter of fact, that the prosecution regularly performed its official duty and provided the defendant with whatever materials the prosecution had that it was required to provide. Thus, in the People's view, the court must assume that the prosecution possesses no additional materials, and it falls to the defendant to prove otherwise. In this way, the People argue, Evidence Code section 664 requires the defendant to prove the actual existence of category No. 2 and/or No. 3 materials that were not previously provided before the court can order discovery of those materials under section 1054.9.
This argument is much like the People's previous argument that the Legislature intended to require the defendant to prove the actual existence of the documents he is seeking before the court can order discovery under section 1054.9. Although both arguments have some superficial appeal, acceptance of either of them would essentially eviscerate the discovery rights the statute was designed to provide.
As we explained above, a defendant in a given case may have no idea whether the materials he obtained from trial counsel amount to all of the materials the prosecution turned over during trial. Consider, for example, a defendant who can prove there was a discovery order issued at time of trial but does not know if the materials he has obtained from trial counsel include all of the materials the prosecutor produced in compliance with that order. This defendant makes a motion for discovery under section 1054.9, explains his situation, and requests all of the materials that were subject to the discovery order. In the People's view, proof of the discovery order triggers the official duty presumption of Evidence Code section 664 and requires the court to assume that the prosecution has already turned over everything that it was required to turn over under that order. It then falls to the defendant to prove either that the prosecution did not turn over everything it was supposed to (i.e., that he is seeking category No. 2 materials) or that he did not receive from his trial counsel everything that the prosecution turned over (i.e., that he is seeking category No. 1 materials). Regardless of the alternative, however, the defendant is put to the burden of proving the existence of documents he does not havea burden he may have no means of meeting.
This example shows that the impact of the application of Evidence Code section 664 to a motion for discovery under section 1054.9 extends beyond categories Nos. 2 and 3 materials to category No. 1 materials, because the defendant in a given case may have no basis for distinguishing between the various categories. Thus, as we have observed already, if the People's argument were to prevail, even the "main focus" of section 1054.9"to permit reconstruction *763 of lost files" (In re Steele, supra, 32 Cal.4th at p. 694, 10 Cal.Rptr.3d 536, 85 P.3d 444)could be virtually impossible for a defendant to achieve. We will not attribute the Legislature an intent to create a statutory scheme for discovery that in many cases will achieve nothing. Consequently, we conclude the Legislature did not intend the official duty presumption of Evidence Code section 664 to require a defendant seeking discovery under section 1054.9 to prove the actual existence of materials in the possession of the prosecution and/or the relevant law enforcement authorities before the court can order discovery under the statute.
Indeed, this case provides a prime example of why the Legislature could not have intended to impose such a requirement. In moving for discovery of the original police notes, which were within the scope of a discovery order issued at time of trial, Barnett asserted that no such notes were ever provided; but he did not offer any assertion about whether such notes existed, nor does it appear he had any ability to prove the existence of such notes. If the People's argument were correct, then the People could have successfully opposed the motion solely on the ground that Barnett had not proved the existence of any original police notes and thereby avoided reviewing the prosecution's files again for discoverable materials. Recall, however, that in response to Barnett's discovery motion, the district attorney and his chief investigator did review their files and "discovered a number of sheets of notes which appear[ed] to be interview notes of witnesses." Thus, documents within the scope of the discovery order that Barnett could not prove existed did exist, but probably never would have come to light if the People's interpretation of the statute were to prevail.
In summary, we conclude that in moving for discovery under section 1054.9, the defendant does not have to prove the actual existence (or a good faith belief in the actual existence) of discovery materials in the possession of the prosecution and/or the relevant law enforcement authorities as a prerequisite to obtaining an order for discovery under the statute.[11]

C

Materials In The Defendant's Possession
The People's final argument in defense of the trial court's denial of Barnett's request for discovery of interview notes from the out-of-state law enforcement officers is that "Barnett has not indicated what materials in this category, if any, he currently possesses." According to the People, because section 1054.9 "covers only materials to which `defendant would have been entitled at time of trial' but does not currently possess" (In re Steele, supra, 32 Cal.4th at p. 695, 10 Cal.Rptr.3d 536, 85 P.3d 444), "in requesting materials pursuant to section 1054.9, a petitioner must show that the requested materials are not in his or her possession."
Barnett complains that "[t]his argument was not made below, and should not be heard here." Barnett is mistaken. The People offered this very same argument in their response to Barnett's motion in the trial court.
On the merits, Barnett contends this argument fails because "it is unsupported in the statute and such a rule would violate due process and the work product privilege." He also contends that he "did identify *764 which trial discovery documents were in trial counsel's files."
We agree with Barnett that the requirement the People advocate is not supported by the language of the statute, and thus we do not reach the issues of due process and work product. Section 1054.9 requires nothing more than the showing of good faith, but unsuccessful, efforts to obtain the materials from trial counsel before moving for a discovery order under the statute. Such a showing can be made in several ways without creating an inventory of every single document or other item the defendant possesses already. In Steele, the defendant provided a declaration from his current attorney attesting that he had reviewed trial counsel's file and interviewed trial counsel and ascertained that the materials sought in the motion were not provided to trial counsel. (In re Steele, supra, 32 Cal.4th at p. 689, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Here, Barnett's motion attested to the transfer of trial counsel's entire trial file through several attorneys to his present attorneys and identified the numbered discovery pages in trial counsel's file that were missing or illegible.[12] Since the People provided the numbered discovery in the first place, they could determine what documents Barnett obtained from his trial counsel and which of those documents he now did not have. They were entitled to nothing more.[13]

D

Conclusion
For the reasons set forth above, we conclude the trial court abused its discretion when it denied Barnett's request for any original notes taken by the 22 out-of-state law enforcement officers who conducted interviews of witnesses who testified at trial (as identified in Barnett's second brief regarding discovery). Accordingly, we will grant this aspect of Barnett's petition and order the issuance of a writ of mandate directing the trial court to correct this error.

III

Criminal Records And Charges
In its February 1987 discovery order, the trial court granted Barnett's requests for "[t]he criminal record of all witnesses who may be called to testify at the trial of this case" and for "all agreements, promises, threats, inducements, offers of reward or immunity, witness fees, transportation assistance, assistance to members of the witness' family or to associates of the witness, or affirmative representations, whether written or oral, made or implied to such persons or to their attorneys, executed or not, in an effort to obtain information or testimony as to the investigation and/or prosecution of the offenses charged in the information." The court, however, did not grant Barnett's request for discovery of "all pending criminal charges against [all witnesses who may be called to testify at trial in this case] anywhere in the State of California, all information regarding the current parole and/or probation status of such persons, and all arrests, criminal charges, ongoing criminal investigations, or actions pending anywhere in the State of California since the date of the *765 alleged offense charged in the Information." Apparently, the court limited this request to only Barnett and his alleged coparticipant.
In his motion for discovery under section 1054.9, Barnett asserted that the prosecution failed to comply or did not fully comply with the two requests the trial court granted. Barnett asserted that because the prosecution did not provide the complete criminal record for all prosecution witnesses, he "cannot say whether other witnesses had charges pending against them or were otherwise under the control of the court or probation office when they testified." He also argued that the trial court had erroneously denied his request for discovery of the pending charges against, and parole and/or probation status of, the prosecution's witnesses. Accordingly, Barnett requested "any records indicating that charges were pending or contemplated against any State witness prior to their testimony against Mr. Barnett and for a period of one year after his sentencing on November 30, 1988." He also requested "the complete criminal record of all the State's witnesses, including arrests, felony and misdemeanor convictions, ongoing criminal investigations, probation and/or parole status, and actions pending against each witness within and without California."
In their informal response to this request, the People did not provide any of the requested information, asserting the request was "[t]oo broad and factually impossible to determine."
Barnett contended "the prosecution was obliged to disclose the information no matter how burdensome it may have been to compile" because the information "could have been used to impeach the State's witnesses."
In their formal response, the People stood by their assertion that the request was "over broad" and contended the trial court had recognized as much "when it limited a similar pre-trial request to only the petitioner and [his] co-participant."
In ruling on this request, the trial court first noted that it had already ordered discovery of "[t]he discoverable items herein" in ruling on an earlier request. (Specifically, the trial court had granted Barnett's request for any agreements, promises, inducements, or offers of immunity.) The trial court then ruled that "[t]he balance of material listed herein does not fall within the Steele criteria, and the request for discovery in those areas is denied."
Barnett contends the trial court's refusal to order discovery of this material was "contrary to Steele" because "[everything requested is information that could have been used to impeach the State's witnesses" and is therefore within the prosecution's constitutional obligation to disclose evidence favorable to the defendant under Brady v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215.
In their response to this argument, the People contend "this request is beyond the scope of section 1054.9 in that it seeks materials or information that post-date the trial." To the extent Barnett sought "any records indicating that charges were pending or contemplated against any State witness ... for a period of one year after [Barnett's] sentencing on November 30, 1988," we agree. By its very terms, section 1054.9 covers only materials to which the defendant "would have been entitled at time of trial." (§ 1054.9, subd. (b), italics added.) Thus, Barnett's request for records relating to charges pending or contemplated after his trial is beyond the scope of the statute.
The fact that (as Barnett notes) "exculpatory evidence that comes to light after *766 trial must be disclosed" under Brady does not change this result. Whether the People had a posttrial duty under Brady to disclose to Barnett criminal charges that were pending or contemplated against one of their witnesses within a year after Barnett was sentenced has nothing to do with whether the People can be ordered to produce such information under section 1054.9. Because it is limited to materials to which the defendant would have been entitled at time of trial, that statute simply does not provide a vehicle for a defendant to enforce any posttrial Brady obligations the People may have.
Other than Barnett's request for information postdating the trial, it does not appear to us that the People are offering any argument against the requests now at issue that we have not rejected already. Nonetheless, because we presume the trial court's order is correct and the burden is on Barnett to establish an abuse of discretion (see Denham v. Superior Court, supra, 2 Cal.3d at p. 566, 86 Cal.Rptr. 65, 468 P.2d 193), Barnett still bears the burden of persuading us that his requests are proper under section 1054.9 and Steele. To carry this burden, Barnett must persuade us the materials he is seeking fall within one of the Steele categoriesthat is, are materials to which he would have been entitled at time of trialand that the trial court abused its discretion in concluding otherwise. He has failed to do so.
As noted above, Barnett contends "[everything requested is information that could have been used to impeach the State's witnesses" and therefore falls within the prosecution's duty to disclose under Brady. In other words, Barnett contends they are category No. 2 materialsi.e., materials "the prosecution should have provided at time of trial because they came within ... the constitutional duty to disclose exculpatory evidence." (In re Steele, supra, 32 Cal.4th at p. 697, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Thus, the question is this: Did the prosecution have a duty under Brady to disclose to Barnett: (1) "any records indicating that charges were pending or contemplated against any State witness prior to their testimony against Mr. Barnett" and "the complete criminal record of all the State's witnesses, including arrests, felony and misdemeanor convictions, ongoing criminal investigations, probation and/or parole status, and actions pending against each witness within and without California"?[14] To answer that question, we must examine the scope of the prosecution's duty under Brady.
"The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant. [Citation.] [¶] But such evidence must be both favorable to the defendant and material on either guilt or punishment. [Citation.] [¶] Evidence *767 is `favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.] [¶] Evidence is `material' `only if there is a reasonable probability that, had [it] been disclosed to the defense, the result ... would have been different.' [Citations.] The requisite `reasonable probability' is a probability sufficient to `undermine[ ] confidence in the outcome' on the part of the reviewing court." (In re Sassounian (1995) 9 Cal.4th 535, 543-544, 37 Cal. Rptr.2d 446, 887 P.2d 527, fn. omitted.)
Under the foregoing principles, the fact that evidence could have been used for impeachment purposes alone does not mean that evidence is subject to the Brady duty of disclosure and therefore something to which the defendant is entitled under section 1054.9. Showing that evidence could have been used for impeachment purposes satisfies the requirement that the evidence must be "favorable" to the defendant; however, to fall within the constitutional duty of disclosure, the evidence must also be "material"that is, it must be of such significance that it raises a reasonable probability the result at trial would have been different if it had been disclosed to the defense.[15]
Here, Barnett has made no effort to show that the materials he is seeking meet this materiality standard, and this omission is fatal. Steele makes clear that, to obtain a discovery order under section 1054.9, the defendant bears the burden of showing that the materials he is requesting are materials to which he would have been entitled at time of trial. (See In re Steele, supra, 32 Cal.4th at p. 688, 10 Cal.Rptr.3d 536, 85 P.3d 444 ["section 1054.9's discovery ... is limited to, specific materials ... that the defendant can show fall into any of these categories ..."]; see also ibid, at p. 697, 10 Cal.Rptr.3d 536, 85 P.3d 444.) Barnett has not carried that burden here because he has not shown that the materials he is seeking were subject to disclosure under Brady.[16]
The cases Barnett cites to support his discovery request are of no assistance to him. In People v. Coyer (1983) 142 Cal. App.3d 839, 191 Cal.Rptr. 376, the appellate court concluded that a defendant was "entitled to discovery of criminal charges *768 currently pending against prosecution witnesses anywhere in the state." (Id. at p. 842.) Coyer, however, did not address the constitutional duty of disclosure; instead, Coyer was decided under the case law that governed criminal discovery in California before 1990. Thus, Coyer does not support Barnett's claim to these materials under Brady.
Of course, because the trial in this case occurred in 1988, discovery at time of trial was governed by the pre-1990 case law, and it could be argued that under Coyer Barnett was entitled to the materials he now seeks. That argument does not assist Barnett, however, because he specifically asked the trial court for discovery of these materials at time of trial, but the trial court denied his requests. For this reason, Barnett cannot now claim he was entitled to these materials at time of trial because they fell within the scope of the February 1987 discovery order; they plainly did not. Moreover, section 1054.9 does not provide a vehicle for Barnett to make a belated challenge to that discovery order. If Barnett believed the trial court wrongfully denied his request for discovery of these materials at time of trial, he needed to raise that issue on appeal from his conviction. Having failed to do so, Barnett is now precluded from contending he was entitled to these materials at time of trial unless he demonstrates they were subject to the constitutional duty of disclosure.
Barnett's reliance on People v. Santos (1994) 30 Cal.App.4th 169, 35 Cal.Rptr.2d 719 is likewise misplaced. In Santos, the appellate court concluded that "the due process clause of the federal Constitution compels disclosure of misdemeanor convictions of witnesses when requested by defendant." (Id. at p. 173, 35 Cal.Rptr.2d 719.) In reaching that conclusion, however, the court failed to note or apply the requirement (later explained in Sassounian) that to be subject to the constitutional duty of disclosure, evidence must be "material," such that there is a reasonable probability the result of the trial would have been different if the evidence had been disclosed. Thus, Santos is of no help either.
In People v. Hayes (1992) 3 Cal.App.4th 1238, 5 Cal.Rptr.2d 105, the appellate court determined that the trial court erred in denying a discovery request for "`the alleged victim's criminal convictions, pending charges, status of being on probation, any acts of victim's dishonesty and, any prior false reports of sex offenses by the victim'" because such evidence was within the prosecution's constitutional duty of disclosure. (Id. at pp. 1243-1245, 5 Cal. Rptr.2d 105.) Upon doing so, however, the appellate court remanded the case to the trial court for that court to determine if the evidence (assuming it existed) was material. (Id. at p. 1245, 5 Cal.Rptr.2d 105.) The flaw in this approach is that, as previously shown, evidence is not within the prosecution's constitutional duty of disclosure unless it is both favorable and material. In essence, the appellate court in Hayes found a Brady violation without determining whether the evidence at issue was material. That was erroneous, and therefore Hayes is of no use to us.
In the remaining three federal cases and two state cases Barnett cites, the appellate courts both recognized and applied the materiality element of the constitutional duty of disclosure. (See Crivens v. Roth (7th Cir.1999) 172 F.3d 991, 998 [finding a Brady violation where the prosecution failed to disclose the criminal record of a witness whose "testimony form[ed] the heart of the state's case against" the defendant]; U.S. v. Steinberg (9th Cir.1996) 99 F.3d 1486, 1492 [finding a Brady violation because the prosecution failed to disclose *769 evidence of ongoing criminal activity by a "key witness in the trial"], disapproved on other grounds in U.S. v. Foster (9th Cir.1999) 165 F.3d 689, 692, fn. 5; United States v. Auten (5th Cir.1980) 632 F.2d 478, 482 [finding a Brady violation where the prosecution failed to disclose additional convictions of a witness whose testimony was "of substantial weight"]; People v. Little (1997) 59 Cal.App.4th 426, 429-435, 68 Cal.Rptr.2d 907 [concluding the prosecution had a duty to disclose the felony conviction of a witness whom the trial court characterized as a "`critical witness'" whose "`credibility was very, very important in this case'"]; People v. Martinez (2002) 103 Cal.App.4th 1071, 1081-1082, 127 Cal.Rptr.2d 305 [finding a Brady violation where the prosecution failed to disclose pending charges against a "pivotal witness"].) These cases do not help Barnett because he has made no showing of materiality here.
At first glance, there may appear to be a conceptual problem in requiring a defendant to demonstrate the materiality of evidence that may not even exist, but that difficulty is illusory. If the defendant seeks the discovery of materials under section 1054.9 on the ground he was entitled to them at time of trial because they fell within the prosecution's constitutional duty of disclosure, he must simply describe those materials with sufficient particularity to explain whyassuming they existthey would have been both favorable and material and thus subject to disclosure. It will then be for the trial court to decide, in the exercise of its discretion, whether the defendant has shown both the favorableness and the materiality of the evidence the defendant seeks. If the defendant cannot describe evidence that would be both favorable and material, then he has not shown that what he is seeking qualifies as "discovery materials" under section 1054.9, that is, something to which he would have been entitled at time of trial.[17] If, however, the trial court concludes the defendant has met his burden of showing favorableness and materiality and thus shown a potential Brady violation, the defendant is entitled to a discovery order for that evidence under section 1054.9. Of course, if the requested material does not exist or is not in the possession of the prosecution or the relevant law enforcement officials, then the People need simply say so in responding to the discovery order.
Here, Barnett has never made any effort to explain why "any records indicating that charges were pending or contemplated against any State witness prior to their testimony against Mr. Barnett" and "the complete criminal record of all the State's witnesses, including arrests, felony and misdemeanor convictions, ongoing criminal investigations, probation and/or parole status, and actions pending against each witness within and without California" were material, such that the evidence, if it exists, would raise a reasonable probability the result at trial would have been different had it been disclosed.
Part of the problem is the breadth of Barnett's discovery request. It is so broad it would encompass the criminal records of witnesses whose testimony was of little or no value in securing his conviction. Certainly such evidence is not "material" so as to fall within the constitutional duty of disclosure and thus is not evidence to which Barnett was entitled at time of trial under Brady.
*770 Moreover, even as to witnesses who might have been "key" or "pivotal," any additional impeachment evidence that might have been available, such as convictions or pending charges, would not necessarily have been material. It is possible that an extensive amount of impeachment materials were already offered for such witnesses (assuming there were any) and that the presence of some additional impeachment evidence might not have made any difference. We cannot determine if that is the case, however, because Barnett has made no attempt to address the materiality element of the constitutional duty of disclosure.[18]
Having failed to show the materiality of the evidence he seeks, Barnett has failed to show an abuse of discretion by the trial court in denying this discovery request under section 1054.9.

IV

Inducements
Barnett contends the trial court erred in denying his request for discovery of "any inducements offered or made to [six particular] State witnesses." As the People point out, the trial court noted that this request was subsumed in an earlier request for discovery of inducements offered to any witness, which the trial court granted. The trial court denied the subsequent request only "[t]o the extent th[e subsequent] discovery request seeks more than [the earlier request]."
Barnett does not suggest that this request sought anything more than the earlier request, which the trial court granted. Indeed, Barnett fails to address the overlap between the two requests. Section 1054.9 does not give a defendant the right to have the court order duplicative discovery. Accordingly, Barnett has failed to show any abuse of discretion in the trial court's ruling.

V

Lies To Law Enforcement
In his motion under section 1054.9, Barnett contended he was "entitled to know whether any witness had lied to law enforcement." In his initial brief, he asserted this constituted category No. 2 material under Steele.
In their formal response, the People asserted "Nothing exists as to this request beyond that already disclosed to petitioner. Further the prosecution has no duty to actively investigate the facts and circumstances of these activities for the benefit of the petitioner."
The trial court denied this request.
Barnett contends the trial court abused its discretion in denying this request because "[s]uch information is Brady material, and must be disclosed."
The People offer no response to Barnett's assertion that this request seeks Brady material. Instead, they argue that "[g]iven the district attorney's statement [that nothing exists as to this request beyond that already disclosed], the [trial] court did not abuse its discretion in denying a request for materials that do not exist or are not possessed by the relevant agencies."
Barnett complains that "[t]he District Attorney's statement that no responsive records exist was not made under oath, under penalty of perjury" and that "[t]he *771 prosecutor's denial was not the reason the Superior Court denied this request."
As we have noted already, we are not concerned with the reason the trial court denied the discovery request, but only with whether the decision to deny it was correct. Thus, the issue before us (at this point) is whether a trial court abuses its discretion in denying a motion for discovery under section 1054.9 when the People, in their unsworn opposition to the motion, assert that no documents responsive to the discovery request exist beyond those already provided.
It could be argued that requiring a court to order the prosecution to provide the defendant access to materials the prosecution has already asserted do not exist would be an idle act. In construing section 1054.9, however, we must respect the statutory language. The statute provides that "on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall [with an exception not applicable here] order that the defendant be provided reasonable access to" the discovery materials. (§ 1054.9, subd. (a), italics added.) The statute does not allow the People to preempt a discovery order by asserting in an unsworn opposition to the defendant's motion that none of the documents the defendant seeks exist. Nor is it necessarily a meaningless act to require the People to assert their denial of the existence of any responsive document after the issuance of a court order. Particularly where the denial of existence of any further responsive documents is unsworn, the existence of a court order requiring the prosecution to provide access to discovery materials emphasizes the seriousness of the issue.
Moreover, there is an additional reason in this case to require the People to assert their denial of the existence of any responsive materials after the issuance of a discovery order. As previously explained, the trial court here ordered that, with respect to the requests it granted, "if there is no discovery materials or no further discovery materials to be provided beyond what has already been provided, then the [People] should so state in a written declaration to be provided petitioner-defendant on or before the discovery deadline, [¶] The declaration should state the factual basis for the conclusion, quote, nothing exists to be discovered as to this item of discovery, end quote; or, quote, nothing exists as to the discovery item beyond what has already been provided, end quote, [¶] The declaration should address what efforts were made to find the item or items of discovery, including what, if any, agencies or individuals were contacted and their responses."
If we were to determine that Barnett's discovery request was otherwise proper under section 1054.9 and Steele, but that the People's unsworn denial of the existence of any further responsive documents was a sufficient basis for the trial court's denial of the request, then Barnett would be denied the information that the trial court ordered the People to give him with respect to other discovery requests the trial court granted.[19]
For these reasons, we conclude that the People's unsworn denial of the existence of *772 any further responsive documents is not a valid basis for upholding the denial of Barnett's request for discovery of information that any witness lied to law enforcement.[20]
That leaves us with the question of whether the trial court abused its discretion in denying this request because the materials fall within the prosecution's duty of disclosure under Brady. We find no abuse of discretion because, as before, Barnett has failed to demonstrate the materiality of the evidence he seeks. Moreover, the three additional cases he now cites do not excuse his failure because each recognizes and applies the materiality element of the constitutional duty of disclosure. (See Carriger v. Stewart (9th Cir. 1997) 132 F.3d 463, 480 [finding a Brady violation where the prosecution failed to disclose the corrections file of its "star witness"]; U.S. v. Bernah-Obeso (9th Cir. 1993) 989 F.2d 331, 336 [concluding "a material lie by a critical informant-witness about his prior record would be exculpatory and thus discoverable Brady information which the government would be under a Constitutional duty to disclose"]; U.S. v. Brumelr-Alvarez (9th Cir.1992) 991 F.2d 1452, 1458 [concluding that "[e]vidence impeaching the testimony of a government witness falls within the Brady rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence"].)

VI

Ongoing Criminal Activities
In his motion under section 1054.9, Barnett contended he was "entitled to know of any state witness's ongoing criminal activities." In his initial brief, he asserted this constituted category No. 2 material under Steele.
In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. Further the prosecution has no duty to actively investigate the facts and circumstances of these activities for the benefit of the petitioner."
The trial court denied this request.
Barnett contends the trial court erred in denying this request because "a witness who is committing crimes has a motive to help law enforcement in order to avoid punishment for his own crimes." In essence, Barnett contends once more that the information he is seeking would have been relevant for impeachment purposes and was thus discoverable under Brady. The People do not offer any argument against this request that we have not already rejected. Once again, however, Barnett has failed to show the materiality of the evidence he seeks. Accordingly, he has again failed to show the trial court abused its discretion in denying his request.

VII

Drug Use Or Addiction
In his motion under section 1054.9, Barnett contended he was "entitled to disclosure of any information in the government's possession indicating that a witness was a drug addict or used drugs." In his initial brief, he asserted this constituted category No. 2 material under Steele because "[s]uch information is relevant to the witness's ability to perceive and recall events and also as impeachment material."
*773 In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. Further the prosecution has no duty to actively investigate the facts and circumstances of these activities for the benefit of the petitioner."
The trial court denied this request.
Barnett contends the trial court erred in denying this request because "such evidence is impeaching, showing that the addict's testimony is inherently suspect and that the fact of addiction is probative of other motive for testifying." The People do not offer any argument against this request that we have not already rejected.
The two California cases Barnett cites on this point are inapposite. In People v. Melton (1988) 44 Cal.3d 713, 736-737, 244 Cal.Rptr. 867, 750 P.2d 741, the court concluded that "[a] witness's drug intoxication may indeed be a basis for impeaching his credibility," but that conclusion related to a witness the defendant claimed was intoxicated at the time he was testifying. In People v. Rocha (1971) 3 Cal.3d 893, 901, 92 Cal.Rptr. 172, 479 P.2d 372, the court concluded "[e]vidence of consumption of narcotics is admissible for impeachment purposes if there is expert testimony substantiating the effects of such use," but that conclusion related to a witness (the defendant himself) who was allegedly under the influence of marijuana at the time of the crime. Neither of these cases stands for the proposition that evidence of a witness's drug use or addiction in general is relevant for impeachment purposes.
The federal cases on which Barnett relies provide some support for the proposition that when an informant witness is also a drug addict, the witness's drug addiction is relevant to his credibility. For example, in United States v. Kinnard (D.C.Cir.1972) 465 F.2d 566, 570, the court stated that "a government informer's addiction to narcotic drugs and his indictment for narcotics violations ... increased] the danger that he will color his testimony to place guilt on the defendant for his own benefit." These cases, however, do not support the broader proposition that any witness's drug addiction is relevant to the witness's credibility. In the absence of any other authority, we conclude that Barnett has failed to show that the materials he seeks would have been favorable to him; thus, we need not address his failure (once again) to demonstrate their materiality. Under these circumstances, the trial court did not abuse its discretion in denying this request.

VIII

Motive To Lie Or Bias
In his motion under section 1054.9, Barnett contended he was "entitled to disclosure of any information in the government's hands regarding any of its witnesses' motives to lie or biases for the State or against Mr. Barnett." In his initial brief, he asserted this constituted category No. 2 material under Steele.
In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. Further the prosecution has no duty to actively investigate the facts and circumstances of these activities for the benefit of the petitioner."
The trial court denied this request.
Barnett contends the trial court abused its discretion in denying this request because "[s]uch evidence is quintessential impeachment material." The People do not offer any argument against this request that we have not already rejected.
We agree with Barnett that materials reflecting any motive to lie or bias by the People's witnesses for the People or *774 against Barnett would have been favorable to him, but he has again failed to make any showing of materiality. Accordingly, the trial court did not abuse its discretion in denying this request.

IX

Records
In his motion under section 1054.9, Barnett contended he was entitled to the following records regarding all of the People's witnesses: probation records, juvenile records, mental health records, governmental records indicating drug use and/or addiction, and prison records. In his initial brief, he asserted these records constituted category No. 2 and/or category No. 4 material under Steele.
In their formal response, the People asserted they were not in possession of any probation reports that were in the hands of the court or the probation office and that "[t]he rest of the request is to items outside of the prosecution team's possession or knowledge."
The trial court denied this request.
Barnett contends "[t]he trial court's ruling is contrary to law because probation, juvenile, and mental health records may be used to impeach."[21] The People do not offer any argument against this request that we have not already rejected.
Barnett first relies on Davis v. Alaska (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 for the proposition that he was entitled to discovery of the juvenile records of the People's witnesses. In People v. Hammon (1997) 15 Cal.4th 1117, 1124, 65 Cal.Rptr.2d 1, 938 P.2d 986, however, our Supreme Court explained that Davis v. Alaska did not involve discovery rights: "By its terms, the decision in Davis ... involved a defendant's trial rights only: The court held a defendant could not be prevented at trial from cross-examining for bias a crucial witness for the prosecution, even though the question called for information made confidential by state law [i.e., the witness's juvenile probationary status]."
Under Pennsylvania v. Ritchie (1987) 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40, however, juvenileand other potentially confidentialrecords in the possession of the prosecution may be subject to discovery because "the due process clause requires the `government' to give the accused all `material' exculpatory evidence `in its possession,' even where the evidence is otherwise subject to a state privacy privilege, at least where no clear state policy of `absolute' confidentiality exists." (People v. Webb (1993) 6 Cal.4th 494, 518, 24 Cal. Rptr.2d 779, 862 P.2d 779.) Again, however, Barnett has failed to demonstrate the materiality of the evidence he seeks, which is a prerequisite to demonstrating his entitlement to that evidence under Brady and section 1054.9. Accordingly, he has failed to show the trial court abused its discretion in denying this request.

X

Work Product In District Attorney's Files
In his motion under section 1054.9, Barnett requested the "Butte County District Attorney's files regarding [himself] and Thomas Burgess [his alleged coparticipant]." In his initial brief, he explained *775 that this request was limited to documents "the State has not yet disclosed" and included "a request for documents that the District Attorney claims are work product"specifically, a file box that the district attorney had pointed out to Barnett's attorneys and told them he was not going to disclose. Barnett requested that the court order the People "to file a privilege log, describing each document withheld with sufficient specificity to enable [him] to argue that such document is not covered by the statutory work product protection and should be disclosed."
In their formal response, the People asserted that they had "disclosed all discoverable matters," but had "not discovered papers reflecting the prosecution's own impressions of witnesses, trial notes, and legal researchi.e. work product, not required to be disclosed."
The trial court denied this request.
Barnett contends the trial court's ruling was an abuse of discretion "because the District Attorney is not entitled to claim work product protection in these circumstances and because the trial court failed to examine any of the materials in camera for Brady material."
Barnett's first contentionthat the People are not entitled to claim work product protection in these circumstancesis premised on his belief that his "right to Brady material must overcome the work product protection." Defendant's belief is correct (see People v. Collie (1981) 30 Cal.3d 43, 59, fn. 12, 177 Cal. Rptr. 458, 634 P.2d 534 [work-product doctrine "manifestly ... cannot be invoked by the prosecution to preclude discovery by the defense of material evidence, or to lessen the state's obligation to reveal material evidence even in the absence of a request therefor"]); however, the assertion that the People are not entitled to claim work product protection is true only if, and to the extent, the documents the People have withheld actually include Brady material. It is because of the possibility that the documents withheld include Brady material that Barnett offers his second contentionthat the trial court was obliged to conduct an in camera review of the documents or at least require the People to provide a privilege log. In essence, Barnett wants the trial court to examine in camera, and/or the People to prepare a privilege log for, those documents in the district attorney's files regarding himself and Thomas Burgess that the district attorney contends are protected as work product, because some of those documents may contain Brady material.
The People assert that "the prosecution has the final word on what is disclosed pursuant to Brady and an in camera review of the prosecution's files is not constitutionally nor statutorily compelled." In support of this argument they cite Pennsylvania v. Ritchie, supra, 480 U.S. at p. 59, 107 S.Ct. at p. 1002, 94 L.Ed.2d at pp. 58-59, in which the court stated that "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files.... Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." (Fn.omitted.)
This passage from Pennsylvania v. Ritchie is inapposite because Barnett is not seeking the right to personally examine the documents the People withheld to determine if they contain Brady material; rather, he is seeking to have the trial court conduct that examination. In fact, Ritchie actually supports Barnett's position because in Ritchie, the Supreme Court held that confidential records in the possession *776 of the prosecution that are not subject to a clear state policy of absolute confidentiality are subject to discovery if they contain Brady material, and "[w]hen the state seeks to protect such privileged items from disclosure, the Court must examine them in camera to determine whether they are `material' to guilt or innocence." (People v. Webb, supra, 6 Cal.4th at p. 518, 24 Cal.Rptr.2d 779, 862 P.2d 779.)
It is important to note, however, that Barnett cannot simply request discovery of all of the district attorney's work product and thereby require the trial court to examine all such documents for Brady material. This is so because, as our Supreme Court noted in City of Los Angeles v. Superior Court (2002) 29 Cal.4th 1, 124 Cal.Rptr.2d 202, 52 P.3d 129, under Ritchie a defendant cannot "`require the trial court to search through [privileged documents] without first establishing a basis for his claim that [they] contain material evidence' [citation], that is, evidence that could determine the trial's outcome, thus satisfying the materiality standard of Brady, supra, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.'" (City of Los Angeles v. Superior Court, supra, 29 Cal.4th at p. 15, 124 Cal.Rptr.2d 202, 52 P.3d 129, quoting Pennsylvania v. Ritchie, supra, 480 U.S. at p. 58, fn. 15, 107 S.Ct. at p. 1002, fn. 15, 94 L.Ed.2d at p. 58, fn. 15.)
Here, Barnett has not addressed whether the documents he is seeking constitute "material" evidence. Thus, he has not met the threshold burden required to trigger the trial court's obligation to review the documents in camera for Brady materials. Under these circumstances, we find no abuse of discretion in the trial court's denial of this discovery request.

XI

Rap Sheets And Police Reports Regarding Juror C.L.
In his motion under section 1054.9, Barnett requested "[r]ap sheets, police reports, and any other portions of the Butte County Superior Court's file on Juror [C.L.]'s certificate of rehabilitation which have not yet been disclosed to Mr. Barnett's counsel." In his initial brief, he explained that his postconviction investigation had revealed that C.L. was ineligible to serve on a jury because he had prior felony convictions and his civil rights had not been restored, despite his statement to the contrary on his juror questionnaire.[22] Barnett further explained that the superior court had denied him copies of the rap sheet and the police reports that were in the court file. He contends that "[t]he information in the sealed portion of the court file, as well as any information in the possession of the District Attorney and law enforcement agencies involved in investigating [C.L.]'s past criminal conduct and his application for certificate of rehabilitation, must be disclosed."
In their formal response, the People asserted that "[j]uror [C.L.] was not a witness and therefore the People are not required to supply petitioner with any information about him under any conceivable discovery rule and particularly not under Penal Code section 1054.9."
Noting that it had "reviewed what is available in action 82726"the court case in which C.L. sought a certificate of rehabilitationthe *777 trial court denied this request. The court stated for the record that it had placed a copy of the court file in a sealed envelope as a court exhibit.
Barnett contends he has "stated a reasonable basis to believe that there is relevant evidence in Juror [C.L.J's file," and he "urges this Court to examine the records and disclose any information that would bolster the claim that Juror [C.L.] lied during voir dire about his own criminal record or that of his family."
We deny this request because the present proceedingan original writ proceeding brought to obtain appellate review of the trial court's ruling on a motion under section 1054.9is simply not the proper vehicle for Barnett to obtain what he seeks. Section 1054.9 allows a defendant to obtain discovery from the prosecution and/or the law enforcement authorities involved in investigating or preparing the case against the defendant of materials in their possession. It does not provide a vehicle for seeking access to sealed portions of a court file from the court.
Barnett argues that "[a]ny postconviction discovery mechanism that does not allow for such discovery violates the Sixth and Fourteenth Amendment right to be tried by a fair and impartial jury and the Fourteenth Amendment right to due process in state postconviction proceedings." We are not persuaded, as Barnett cites no authority supporting that proposition. The general principle he cites that once a state makes postconviction review available, "its operation must conform to the due process requirements of the 14th Amendment" (Easter v. Endell (8th Cir. 1994) 37 F.3d 1343, 1345) is not enough to sustain his argument because Barnett fails to explain why a statute that provides for postconviction discovery from the prosecution and relevant law enforcement authorities violates due process if it does not also provide for discovery of sealed materials in the possession of the court.
Barnett next contends that even if section 1054.9 "does not authorize such disclosure, then the Superior Court had inherent power to authorize disclosure." Again, however, Barnett cites no authority for this assertion. Moreover, whether the court has such authority is simply not a question that is properly answered in this proceeding, which is a proceeding to obtain discovery from the prosecution and/or the law enforcement authorities involved in investigating or preparing the case against him.
Because the materials at issue include "rap sheets" and police reports, however, the question remains whether Barnett is entitled to obtain discovery of those documents that are in the possession of the prosecution and/or the relevant law enforcement authorities, and not simply in the court file relating to C.L.'s certificate of rehabilitation. We address that question next.

XII

Criminal Records Of Jurors CL. And L.F.
In addition to requesting the materials addressed above regarding Juror C.L., in his motion under section 1054.9 Barnett requested more broadly "information regarding any arrests or convictions and all criminal activity known to law enforcement for [C.L.] and [L.F.] and their family members." In his initial brief, Barnett broadened this request even further, asserting that he was seeking "information regarding any arrests or convictions and all criminal activity known to law enforcement for the trial jurors, especially [C.L.] and [L.F.] and their family members." (Italics added.) He contended this information *778 constituted category No. 4 material under Steele.
In their formal response, the People incorporated their response to Barnett's previous request.
The trial court denied this request.
Barnett contends the trial court erred in this ruling because he "has good cause for seeking this discovery." According to Barnett, his own postconviction investigation has uncovered information that C.L. "lied about his own criminal record and that of his adult sons" and that L.F. "concealed his own illegal drug use during the trial and his connections with criminals." Barnett further contends that both jurors have no privacy interest in their records because they are now deceased.
Good cause for the discovery is not the relevant standard, however. As we have repeatedly stated, section 1054.9 entitles a defendant to discovery only of materials to which he would have been entitled at time of trial. Thus, to convince us the trial court erred, Barnett must convince us that he would have been entitled to the criminal records of C.L. and L.F. (and presumably the other trial jurors) at time of trial.
Barnett first cites People v. Murtishaw (1981) 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 for the proposition that he "is entitled to information concerning the jurors in the hands of the prosecution and law enforcement agencies involved in the investigation of the case." That is an overstatement of the holding in Murtishaw. In Murtishaw, the defendant moved for "discovery of prosecutorial investigations of prospective jurors or for $1,000 to enable the defense to conduct a similar investigation." (Id. at p. 765, 175 Cal. Rptr. 738, 631 P.2d 446.) Despite the district attorney's acknowledgement "that his office had conducted field investigations of prospective jurors and maintained records showing how the jurors had voted in prior cases and whether they had arrest records," the trial court denied the defendant's motion. (Ibid.)
On review, the Supreme Court observed that "[w]hen courts ... deny defendants who cannot afford similar investigations access to the prosecutor's records, the result is that prosecutors in case after case will have substantially more information concerning prospective jurors than do defense counsel. Such a pattern of inequality reflects on the fairness of the criminal process." (People v. Murtishaw, supra, 29 Cal.3d at pp. 766-767, 175 Cal.Rptr. 738, 631 P.2d 446, fn. omitted.) Accordingly, the court held that in future cases trial courts would have "discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution." (Id. at p. 767, 175 Cal. Rptr. 738, 631 P.2d 446.)
Murtishaw is of no assistance here because, as the People point out, "there is no indication in the record that the prosecution engaged in [a field] investigation" of prospective jurors. Absent evidence that the prosecution conducted such an investigation and therefore had "substantially more information concerning [the] prospective jurors than d[id Barnett's] defense counsel," there is no reason to believe that a request for the prosecution's juror information under Murtishaw would have been successful at time of trial, and if Barnett was not entitled to the materials he is seeking at time of trial, then he is not entitled to them under section 1054.9.[23] *779 The question, then, is whether there is any other authority that would have allowed Barnett to obtain from the prosecution the criminal records of any of the jurors at time of trial, even though the prosecution may not have availed itself of the availability of those records.
Barnett contends "[t]he logic of cases such as Brady v. Maryland impels this Court to order disclosure of records in the possession of the government relating to [his] jurors." We cannot agree. "Under Brady, supra, 373 U.S. 83, 87 [83 S.Ct. 1194, 1196-1197], the prosecution must disclose to the defense any evidence that is `favorable to the accused' and is `material' on the issue of either guilt or punishment." (City of Los Angeles v. Superior Court, supra, 29 Cal.4th at p. 7, 124 Cal. Rptr.2d 202, 52 P.3d 129, italics added.) Even assuming a juror's criminal record could be deemed favorable to the defendant, it certainly cannot be deemed material on the issue of guilt or punishment. Thus, Barnett's right to exculpatory information under Brady does not support his request for the criminal records of the trial jurors.
Barnett contends that "[i]f at trial, Mr. Barnett had learned that Juror [C.L.] lied about his criminal record and his civil rights, Mr. Barnett would have been entitled to an inquiry." The authorities Barnett cites, however, stand for nothing more than the proposition that when a question of juror partiality or misconduct arises, the defendant should be given the opportunity to prove juror bias or misconduct. (See, e.g., Smith v. Phillips (1982) 455 U.S. 209, 215, 102 S.Ct. 940, 944-45, 71 L.Ed.2d 78, 85 ["the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"].) Barnett offers no authority for the further proposition that the opportunity to prove juror bias or misconduct includes the right to discovery from the prosecution of materials relating to the juror in question.
Barnett tries to bridge this gap by arguing that "[i]f a prosecutor conceals information about a juror's biases, the prosecutor violates his obligations pursuant to the Due Process Clause." While that may be so, it provides no basis for Barnett's discovery request here. Barnett has offered nothing to suggest that at time of trial the People were aware of, but actively concealed from him, the criminal records of C.L., L.F., or any of the other trial jurors. Moreover, that the People may have the obligation not to conceal information about a juror's biases does not mean a defendant has the right to compel the People to obtain and disclose the criminal records of trial jurors.
In the absence of any authority suggesting that Barnett would have been entitled to compel the People to obtain and provide him with the criminal records of the trial jurors (and their family members) at time of trial, the trial court did not abuse its discretion in denying this request for the same discovery under section 1054.9.

XIII

Criminal Records Of Witnesses' Family Members
In his motion under section 1054.9, Barnett requested "information regarding any arrests or convictions and all criminal activity known to law enforcement for family members of the State's witnesses." *780 In his initial brief, he asserted this constituted category No. 4 material under Steele.
In their formal response, the People asserted that "[n]othing exists as to th[is] request[ ] beyond that already disclosed to petitioner. As already noted, the prosecutor has no duty to actively investigate the facts and circumstances of the case for the benefit of the accused. [Citation.] Nor are the People required to make a complete and detai[l]ed accounting to the defense of all police investigative work on a case."
The trial court denied this request.
Barnett contends "[t]his ruling was an abuse of discretion because such information can be impeaching." Beyond the arguments we have rejected already, the People assert only that the trial court "was within its discretion to deny discovery requests for materials that provide, at most, limited relevance for collateral impeachment of a witness."
In support of his discovery request, Barnett cites People v. Crawford (1967) 253 Cal.App.2d 524, 61 Cal.Rptr. 472. In Crawford, the defendant complained "that his cross-examination of a prosecution witness was unduly restricted by the trial court" because the court "refus[ed] to permit him to cross-examine [a] witness ... in the presence of the jury on the alleged arrest of [the witness's] wife" "the previous night." (Id. at p. 533, 61 Cal.Rptr. 472.) The appellate court concluded "the arrest would have been material to impeach the witness (by showing a motive for testifying against [the defendant]) if it also could be shown by direct or circumstantial evidence that the witness had knowledge of the arrest" but "the defendant failed to offer any proof that the witness knew or could have known of his wife's arrest." (Id. at pp. 533-534, 61 Cal. Rptr. 472.)
At its broadest, Crawford stands for the proposition-that evidence of the recent arrest of a prosecution witness's close family member may be relevant for impeachment purposes if it can be shown that the witness knew of the arrest, because the arrest may provide a motive for the witness to cooperate with the prosecution and thereby may suggest prosecutorial bias on the part of the witness.
U.S. v. Lankford (11th Cir.1992) 955 F.2d 1545the other case Barnett cites in support of his argumentis similar. There, the appellate court held the trial court erred by limiting the defendant's cross-examination of the chief government witness against him about "the fact that [his] sons had been arrested by state authorities for the sale of twenty pounds of marijuana." (Id. at pp. 1548-1549.) According to the appellate court, "Notwithstanding the fact that [the witness] had made no deal with the government concerning a federal investigation into his sons' marijuana arrest, his desire to cooperate may have in fact been motivated by an effort to prevent such an investigation. We cannot imagine a much stronger motive for testifying on behalf of the government than the desire to protect one's children." (Id. at p. 1549, fn. omitted.)
As we have noted previously, "[t]he prosecution's constitutional duty to disclose all substantial material evidence favorable to an accused `extends to evidence which may reflect on the credibility of a material witness.'" (People v. Hayes, supra, 3 Cal.App.4th at p. 1244, 5 Cal. Rptr.2d 105.) Even under the reasoning of Crawford and Lankford, however, the fact that a close family member of a prosecution witness was recently arrested does not reflect on the credibility of the witness unless the witness knows of the arrest. Thus, contrary to Barnett's assertion, the *781 mere fact of the arrest alone is not "impeaching." It is only the combination of the arrest and the witness's knowledge of it that provides a basis for impeaching the witness.
Barnett offers no authority for the proposition that a fact that in and of itself does not bear on a witness's credibility must be disclosed because it might bear on the witness's credibility if another fact is also true. In the absence of such authority, we conclude that Barnett has failed to show an abuse of discretion by the trial court in the denial of this discovery request.
It is also worth noting that even if the arrest of a close family member, by itself, could be deemed impeaching, Barnett's discovery request was not limited to information about any arrest of a close family member of a prosecution witness for which charges could still be brought. Instead, Barnett asked for "information regarding any arrests or convictions and all criminal activity known to law enforcement for family members of the State's witnesses." Thus, Barnett's request encompassed all arrests of family members, not only those for which charges could still be brought, as well as all convictions, which fall outside the reasoning of Crawford and Lankford and have no discernible bearing on the witness's credibility. The overbreadth of Barnett's request provides yet another reason for us to find no abuse of discretion in the trial court's denial.

XIV

Communications Regarding Barnett, The Case Against Him, And The Witnesses
In his motion under section 1054.9, Barnett requested "any document, record or paper and audio or video recording of all information relayed to law enforcement regarding [him], the case against him and the State's witnesses." He also requested "all records of all communications about [him], the case against him, or the State's witnesses between law enforcement and any person, including the dates, times, locations, and details of all such communications." In his initial brief, he asserted these materials fell within the scope of the discovery order from trial and were therefore category No. 2 materials under Steele.[24]
In their formal response, the People asserted that "[n]othing exists as to these requests beyond that already disclosed to petitioner. As already noted, the prosecutor has no duty to actively investigate the facts and circumstances of the case for the benefit of the accused. [Citation.] Nor are the People required to make a complete and detai[l]ed accounting of all police investigative work on a case."
The trial court denied these requests.
Barnett contends the trial court abused its discretion in denying these requests "because the information sought would facilitate the ascertainment of facts and a fair trial" and he "is entitled to discover `any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense.'" The People do not offer any argument against these requests that we have not already rejected.
Since Barnett no longer contends these requests were for materials that fell within the scope of the February 1987 discovery order, we consider these requests as ones for category No. 4 materialsthat is, materials to which he would have been entitled at time of trial if he had asked for *782 them. Viewed in that light, we conclude the trial court did not abuse its discretion in denying these requests.
Barnett cites three authorities in support of his requests.[25] The first is Pitchess v. Superior Court (1974) 11 Cal.3d 531, 113 Cal.Rptr. 897, 522 P.2d 305, in which our Supreme Court explained that "an accused in a criminal prosecution may compel discovery by demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial." (Id. at p. 536, 113 Cal.Rptr. 897, 522 P.2d 305.) The Pitchess court also explained, however, that "[t]he requisite showing may be satisfied by general allegations which establish some cause for discovery other than `a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.'" (Id. at p. 537, 113 Cal.Rptr. 897, 522 P.2d 305, italics added.)
Here, Barnett has not made the showing required by Pitchess because he has not established any cause for his broad discovery requests "other than `a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.'" (Pitchess v. Superior Court, supra, 11 Cal.3d at p. 537, 113 Cal.Rptr. 897, 522 P.2d 305.) Accordingly, Pitchess is of no assistance to him.
The second case Barnett cites is Ballard v. Superior Court (1966) 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838. In Ballard, the court quoted a law review article by Chief Justice Traynor, in which he wrote, "`A showing, however, that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense.'" (Id. at p. 167, 49 Cal.Rptr. 302, 410 P.2d 838.) The court also explained, however, that "[a] defendant's motion for discovery must nevertheless describe the requested information with at least some degree of specificity and must be sustained by plausible justification." (Ibid.)
Here, Barnett does not seek any specific information supported by plausible justification. Instead, his requests for "all information relayed to law enforcement regarding [him], the case against him and the State's witnesses" and "all records of all communications about [him], the case against him, or the State's witnesses between law enforcement and any person" together amount to nothing less than a request for all information the People obtained in their investigation of the crime, which is supported by no particular justification other than the suggestion that something useful to him may be found therein. Ballard, like Pitchess, does not support such broad requests.
Finally, Barnett cites People v. Riser (1956) 47 Cal.2d 566, 305 P.2d 1. There, the court stated that "the state has no interest in denying the accused access to all evidence that can throw light on issues in the case." (Id. at p. 586, 305 P.2d 1.) The court also explained, however, that a defendant's right to compel production of evidence from the prosecution during trial arises only "on a proper showing ... when it becomes clear during the course of trial that the prosecution has in its possession relevant and material evidence." (Id. at pp. 585-586, 305 P.2d 1.)
Barnett has not made any such showing here. His requests for essentially all of *783 the information the People obtained in their investigation of the crime are not requests for "relevant and material evidence." Accordingly, like Pitchess and Ballard, Riser does not support the requests.
In light of Barnett's failure to show that he would have been entitled at time of trial to the materials he seeks, the trial court did not abuse its discretion in denying these requests.

XV

Records Of Conversations With Witnesses
In his motion under section 1054.9, Barnett requested "audio and/or video records and notes or documentation of any sort of any conversations between law enforcement and Delinda Olsen or Philippe Enoingt at their home, or any other person at the Olsen-Enoingt home, from July 7, 1986 through August 31, 1986." In his initial brief, he asserted these materials fell within the scope of the discovery order from trial and were therefore category No. 2 materials under Steele.
In their formal response, the People asserted that "[n]othing exists as to th[is] request[ ] beyond that already disclosed to petitioner. As already noted, the prosecutor has no duty to actively investigate the facts and circumstances of the case for the benefit of the accused. [Citation.] Nor are the People required to make a complete and detai[l]ed accounting to the defense of all police investigative work on a case."
The trial court denied this request.
Barnett contends the trial court's ruling was an abuse of discretion because when Olsen testified against him, there were multiple felony counts pending against her and Enoingt in Butte County. He contends he "was entitled to investigate Olsen and Enoignt's contacts with law enforcement to explore their bias against him or for the State or motive to curry favor with the State." He also claims that "law enforcement had come to [Olsen's] home to discuss the case against Mr. Barnett with her and Enoingt at least twice before ... June 2, 1987" and that "Olsen has stated in a sworn declaration that law enforcement threatened to take Olsen's children from her unless she testified against Mr. Barnett."
The People do not offer any argument against this request that we have not already rejected.
Whether we consider this a request for category No. 4 materials or a request for category No. 2 materials subject to disclosure under Brady,[26] we find no abuse of discretion in the trial court's ruling. In support of this discovery request, Barnett cites only People v. Crawford, supra, 253 Cal.App.2d at page 533, 61 Cal.Rptr. 472 and United States v. Lankford, supra, 955 F.2d at pages 1548-1549, which we have discussed already. Those cases stand for the proposition that evidence of the recent arrest of a prosecution witness's close family member may be relevant for impeachment purposes if it can be shown that the witness knew of the arrest. That proposition has no relevance here. To the extent Barnett seeks these materials on the belief they may contain some evidence of threats Olsen claims were made to get her to testify against Barnett, Barnett has failed to offer any explanation of what Olsen's testimony was or why it was material to his conviction. Absent such an explanation, we conclude he has failed to show an *784 abuse of discretion by the trial court in its denial of this request.

XVI

BINTF
In his motion under section 1054.9, Barnett requested "any notes, reports or documentation of any sort, including audio or video recordings, of any interview or contact by members of the Butte Interagency Narcotics Task Force (BINTF) and any person concerning Mr. Barnett, the case against him, or the State's witnesses, including contacts initiated in pursuance of other criminal cases." In his initial brief, he asserted these materials fell within the scope of the discovery order from trial and were therefore category No. 2 materials under Steele.
In their informal response to this request, the People noted, "Two (2) Daily Information Memo's (DIM's) provided."[27] Barnett complained that one of the two documents was "heavily redacted," and he requested "access to all records in the possession of BINTF regarding [him] in unredacted form."
In their formal response, the People asserted that BINTF was not part of the prosecution team because BINTF did not "assist[ ] in the investigation of the murder with which petitioner was charged." Nevertheless, the People explained that "at the specific request of the petitioner's appellate counsel, the People requested any information that BINTF had in its files on petitioner. The People received that information by way of subpoena and disclosed it to petitioner."
The trial court denied this request.
Barnett contends the trial court abused its discretion in denying this request because "BINTF was involved in the investigation of the case against [him] and codefendant Tom Burgess." Noting the People's production of the two DIM's, Barnett contends "the State recognizes that BINTF was an agency involved in the investigation and prosecution of the case."
The People contend that "Barnett has not established that BINTF was part of the prosecution team as defined by Steele" and "[t]he fact that the prosecutor, in the spirit of cooperation [citation], obtained materials from BINTF on petitioner's behalf in no way establishes that BINTF was part of the prosecution team in this case."
According to Barnett, BINTF was involved in the investigation and prosecution of the charges against him because (1) BINTF arrested Burgess, his alleged coparticipant; (2) BINTF produced (in response to the People's subpoena) a report noting that a "CI" (confidential information or citizen informant) reported that Barnett and Burgess were involved in methamphetamine trafficking; and (3) BINTF admitted in 2001 that it had records regarding Barnett, but they had been destroyed.
The three factors on which Barnett relies do not demonstrate the BINTF was involved in the investigation or prosecution of the case against him. The mere fact that BINTF officers arrested an alleged coparticipant for the same crimes does not establish that agency's involvement in the investigation or prosecution of the case against Barnett. Similarly, the mere fact that BINTF had in its records a report from a "CI" that Barnett and Burgess were both involved in trafficking methamphetamine does not establish that agency's *785 involvement in the investigation or prosecution of the murder case against Barnett. Finally, the fact that BINTF, at one time, had "files concerning Mr. Barnett" does not establish that agency's involvement in the investigation or prosecution of this case against Barnett.
In short, Barnett has not pointed to anything that establishes BINTF was one of the "law enforcement authorities" to which section 1054.9 applies. Accordingly, Barnett has failed to show any abuse of discretion by the trial court in its denial of this request.

XVII

Witnesses' Other Cases
In his motion under section 1054.9, Barnett requested "the case name, number, and county of any case other than People v. Barnett, Butte County Superior Court Case No. 91850, that any witness in the Barnett trial also testified in," as well as "a listing of those witnesses who have provided information to law enforcement in connection with any other investigation" and "documentation, including audio or video recordings of such contacts between witnesses and law enforcement, including the content of such contact, and documentation in any form of law enforcement's evaluation of the witness's credibility." In his initial brief, he asserted "[t]his information may provide impeachment material or, in the case of defense witnesses, evidence that could have been used to bolster their credibility after their credibility was attacked on cross-examination." He further asserted "[t]his information falls within Category 4."
In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner." The People further asserted that the burden placed on the People to comply with the request far exceeded Barnett's need for the discovery.
The trial court denied this request.
Barnett contends this ruling was an abuse of discretion for the same reasons discussed above in connection with his requests for information relayed to law enforcement regarding him and all records of all communications about him. Specifically, Barnett relies on Pitchess, Ballard, and Riser to justify his discovery request because the information requested might lead to the discovery of information that would call into question the credibility of the People's witnesses or bolster the credibility of his witnesses.
The People contend that "[g]iven the speculative and generalized nature of Barnett's request, in addition to its incredible breadth, the respondent court properly denied Barnett's fishing expedition."
Barnett first contends that "the burden on the State is no justification for failing to comply with disclosure obligations." In support of that contention, Barnett cites In re Brown (1998) 17 Cal.4th 873, 72 Cal.Rptr.2d 698, 952 P.2d 715, a case involving the prosecution's failure to comply with its constitutional duty to disclose exculpatory material under Brady. Brown is inapposite here because Barnett's present request was not one for exculpatory Brady material; rather, it was for detailed information about other cases and investigations the witnesses in his trial had participated ininformation which might well have no bearing on the murder case against Barnett at all.
Contrary to Barnett's assertion, the burden on the People of complying with a broad discovery request such as the one at issue here is a relevant factor when the defendant seeks information that is not subject to Brady. Indeed, as Barnett himself later admits (in contradiction of his *786 earlier argument), California case law establishes that, "[a]lthough policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties substantially outweigh the demonstrated need for discovery." (People v. Kaurish (1990) 52 Cal.3d 648, 686, 276 Cal.Rptr. 788, 802 P.2d 278.) Barnett contends, however, that "here, the State made no showing in the Superior Court regarding the burden on the State to provide the information Mr. Barnett seeks."
Barnett cites no authority for the proposition that the People must make an evidentiary showing of the burden involved in complying with a particular discovery request before the trial court can exercise its discretion to deny that request under Kaurish and related authorities. Indeed, there is nothing in Kaurish even suggesting such a requirement. There, the defendant had sought to "discover `police reports pertaining to child molestation killings in the Hollywood area' for the six months preceding and following the murder" at issue. (People v. Kaurish, supra, 52 Cal.3d at p. 686, 276 Cal. Rptr. 788, 802 P.2d 278.) The trial court granted a motion to quash the subpoena, and on review the Supreme Court concluded the trial court did not abuse its discretion. (Id. at p. 687, 276 Cal.Rptr. 788, 802 P.2d 278.) In doing so, the court did not cite to any evidence of the burden the discovery request placed on the People, but instead simply noted that "defendant's request was broad and somewhat burdensome, both with regard to expenditure of police resources to review files and to the privacy interests of third parties." (Ibid.) Presumably the court reached this conclusion based on the face of the request alone.
On its face, Barnett's request here is even more burdensome than the request at issue in Kaurish in that it seeks information on cases and investigations throughout the state involving any witness who testified in Barnett's murder prosecution. Moreover, Barnett's request is not supported by any particularly compelling justification. He has not alleged that he expects to find information bearing on the credibility of the witnesses in the materials he has requested, only that he may find it. Under these circumstances, we find no abuse of discretion in the trial court's denial of this discovery request.

XVIII
Street Talk Regarding Barnett's Innocence
In his motion under section 1054.9, Barnett requested "documentation in any form of any person conveying information to law enforcement in Butte County, including BINTF, regarding Mr. Barnett, the case against him or the witnesses in his case. This request includes information about any person who conveyed information to law enforcement regarding `street talk' about the case, and any `street talk' to the effect that Mr. Barnett was innocent, was being set up and/or was framed." In his initial brief, he asserted these materials fell within the scope of the discovery order from trial and were therefore category No. 2 materials under Steele.
In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. Furthermore, the constitutional mandate of the People to disclose exculpatory evidence to a defendant does not require the prosecutor to disclose a `rumor' of exculpatory evidence."
The trial court granted the request "contained in the first sentence" but denied the *787 request "as far as any, quote, street talk, end quote, is concerned."
Barnett contends "[t]his order is unfathomable'" because "[t]here is evidence in the record that witnesses told law enforcement that `street talk' indicated that Mr. Barnett was being framed," and "[s]uch information is exculpatory and must be disclosed."
The People contend that under Brady, "the prosecution is not required to disclose mere `rumors' of exculpatory evidence." They cite two cases in support of that assertion. The firstUnited States v. Agurs (1976) 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351-352is inapposite, because it deals with the duty of a prosecutor to produce evidence to the defendant when the defendant makes only a general request for Brady material, or no request at all. That is not the case here. Here, we are dealing with the People's duty to produce evidence in response to a specific requestthat is, for "information about any person who conveyed information to law enforcement regarding `street talk' about the case, and any `street talk' to the effect that Mr. Barnett was innocent, was being set up and/or was framed." On that subject, the court in Agurs had this to say: "Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." (Agurs, at p. 106, 96 S.Ct. at p. 2399, 49 L.Ed.2d at p. 351.)
The second case the People citeSmith v. Stewart (9th Cir.1998) 140 F.3d 1263, 1273is somewhat closer on point. There, the defendant argued "that his Brady rights were violated because counsel had not been informed that the police had heard about a rumor in the community to the effect that [his] brother was in the car with him, but that Smith himself had gone into the store to commit the robbery." (Smith v. Stewart, supra, 140 F.3d at p. 1273, fn. omitted.) In rejecting this argument, the court stated: "No doubt under Brady the state had the obligation to disclose favorable evidence to Smith. [Citation.] However, it is pretty difficult to see how the information was favorable. If it were, it was so weak, so remote, and so inconclusive that it is highly unlikely that it would have had any effect whatever upon the verdict, much less would it `undermine confidence in the outcome' of the trial." (Ibid.)
The problem with the People's reliance on Smith is that the rumor in Smith was not really exculpatory, since the rumor only confirmed that the defendant had committed the crime (albeit with the possible assistance of his brother). Here, on the other hand, the "street talk" that Barnett's request sought information about was exculpatory, to the extent that "street talk" was "to the effect that Mr. Barnett was innocent, was being set up and/or was framed." Moreover, it appears Smith, like Agurs, involved the prosecutor's duty to disclose exculpatory evidence when no request for Brady material had been made. This case, on the other hand, involves a request for a specific category of information.
We believe that Barnett's request for information received by law enforcement about "street talk" regarding Barnett's innocence "describe[s] the requested information with at least some degree of *788 specificity" and is "sustained by plausible justification." (Ballard v. Superior Court, supra, 64 Cal.2d at p. 167, 49 Cal.Rptr. 302, 410 P.2d 838.) Thus, had Barnett sought this information at time of trial, he would have been entitled to it, and therefore it was an abuse of discretion for the trial court to deny his request for this information in his motion under section 1054.9.

XIX

Information Regarding Pathologist
In his motion under section 1054.9, Barnett requested "information which the prosecution knew or should have known about [pathologist Gwen] Hall's testimony in other cases involving death by stabbing, including the number of autopsies she had performed on such decedents, testimony in other cases involving death by shotgun shots, including the number of autopsies she had performed, and testimony involving decedents who had been bound, including the number of such autopsies she had performed." Barnett further requested "the preliminary hearing and trial testimony of every case in which Dr. Hall testified as a prosecution witness from 1984-2000 and copies of all coroner's reports relating to such testimony. As to those cases, Mr. Barnett requests the case names and numbers and county where tried." Barnett also requested "copies of any document generated by or in the possession of law enforcement concerning Dr. Hall's credibility and any written complaints pertaining to Dr. Hall's credibility"; "any information regarding arrests and/or convictions of Dr. Hall"; and "a list of all instances in which Dr. Hall changed her reports or testimony in any case, or where an attorney accused her of changing her findings or opinions or of being biased or giving false testimony or fabricating evidence, including the names and numbers of the cases, the county where tried, and the names of the attorneys involved." In his initial brief, he asserted these materials were category No. 2 and/or No. 4 materials under Steele.
In their formal response, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner." The People further asserted that the burden placed on the People to comply with the request far exceeded Barnett's need for the discovery.
The trial court denied the request.
Relying on Pitchess and Ballard, Barnett contends the trial court abused its discretion in denying this request because he is "seek[ing] any information in the hands of the State bearing on Dr. Hall's credibility and expertise."
The People contend that "Barnett's request is beyond the scope of section 1054.9" because he is "seeking materials from as late a date as 2000." To the extent Barnett's request encompasses material that did not exist at time of trial, we agree it is beyond the scope of the statute. As we have explained already, by its very terms section 1054.9 covers only materials to which the defendant "would have been entitled at time of trial." (§ 1054.9, subd. (b), italics added.) Thus, Barnett's request for materials relating to Dr. Hall's involvement in other cases after his trial is beyond the scope of the statute. Whether the People had a posttrial duty under Brady to disclose some or all of this material to Barnett has nothing to do with whether the People can be ordered to produce such information under section 105.9. Because it is limited to materials to which the defendant would have been entitled at time of trial, that statute simply does not provide a vehicle for a defendant to enforce any posttrial Brady obligations the People may have.
*789 Of course, that does not entirely resolve Barnett's request, since the request encompassed other materials that existed (if they existed at all) at time of trial. As to those materials, the People contend the trial court's rating was not an abuse of discretion because the burden on the People of complying with the request outweighed any possible benefit to Barnett of compliance.
"In the exercise of its discretion, the court may compare the defendant's demonstration of need for the matter sought with the burden that would be placed on the prosecution in providing it. [Citations.] Pertinent considerations include whether the demand for discovery is overly broad [citations] and, importantly, the nature of discovery that has been granted." (Lemelle v. Superior Court (1978) 77 Cal.App.3d 148, 165, 143 Cal. Rptr. 450.)
On the issue of burden, Barnett repeats his argument that the People offered no evidence of the burden. We have concluded already, however, that an evidentiary showing is not required. The question is whether the trial court could have reasonably determined that the apparent burden of complying with Barnett's broad request substantially outweighed Barnett's need for discovery. Of course, that requires us to examine the "need" Barnett demonstrated for the information he seeks. On this point, Barnett contends the information he seeks is relevant to impeaching Dr. Hall's credibility. He further claims that he "has already developed evidence that Dr. Hall misrepresented her qualifications in this trial." That evidence consists of a letter from the American Board of Pathology which allegedly shows that Dr. Hall testified falsely at Barnett's preliminary examination when she claimed she had certificates in forensic pathology and anatomic pathology.
Under these circumstances, we find no abuse of discretion in the trial court's ruling. Barnett's request sought an extremely broad array of materials, .including (but not limited to) the preliminary hearing and trial testimony of every case in which Dr. Hall testified as a prosecution witness over a four-year period (from 1984 through 1988), and copies of all coroner's reports relating to such testimony. As justification for that request, Barnett asserted only that Dr. Hall's credibility was in issue because of an allegedly false statement she made at his preliminary examination about her certifications in pathology. It is a matter of great speculation, however, whether any of Dr. Hall's other testimony which Barnett sought to discover would have provided any further basis to challenge her credibility as a witness. Moreover, the trial court granted another request Barnett made for discovery related to Dr. Hallspecifically, his request for "any record to which the prosecution has reasonable access regarding [her] qualifications." In light of all these factors, we cannot say the trial court acted outside the bounds of reason in denying this discovery request.

XX

Homicide Investigation Manuals
In October 2004, after Barnett filed his motion under section 1054.9 and after his attorneys met with the district attorney in an attempt to resolve the matter, Barnett's attorneys noted in a letter to the district attorney that "[t]he recent discovery disclosures" had "prompt[ed some] additional discovery requests." One of those requests was for "the protocols, guidelines or manual in effect in 1986-1988 for homicide investigations by the Butte County Sheriffs Office and the Butte County District Attorney's investigative *790 staff." In his initial brief on the motion, Barnett added this request to those made in the motion and asserted these materials were category No. 4 materials under Steele.
In their informal response to the motion, the People asserted, "No manual existed in 1986-1988." In his second brief, Barnett requested "a declaration to that effect from persons with personal knowledge." In their formal response to the motion, the People asserted that Barnett had "failed to show a plausible justification for" the requested material.
The trial court denied the request.
Barnett contends the trial court's ruling was an abuse of discretion because he is "entitled to investigate the quality of the police investigation in the case against him and to investigate whether the police followed their own protocols in investigating the case."
The People respond that Barnett has not offered a "plausible justification" for his request because the request is "based on nothing more than his speculative hope that something helpful to him will turn up."
The cases on which Barnett relies to support his discovery request may stand for the proposition that evidence of a poor police investigation can be relevant in a criminal prosecution. It does not follow, however, that just because the quality of the investigation is a relevant subject, a trial court abuses its discretion if it refuses to allow discovery of any written protocols, guidelines, or manuals that exist for conducting such investigation. Here, Barnett has not offered any fact or even any allegation suggesting there was something wrong with the quality of the investigation in this case. In the absence of any asserted basis for believing the investigation was flawed, we cannot say the trial court acted beyond the bounds of reason in determining that Barnett had not shown a plausible justification for the discovery he sought. Accordingly, we find no abuse of discretion in the trial court's denial of this request.

XXI

Burgess's Arrests
In their letter to the district attorney in October 2004, Barnett's attorneys noted that Burgess's rap sheet (which was among the missing pages of trial discovery the People had recently provided) "shows that he was arrested on July 10, 1986, and charged with assault with deadly weapon, robbery and possession of narcotics. No disposition of those charges is indicated on the rap sheet. What is the disposition of those three charges? If they were dismissed, when were they dismissed?" In his initial brief on the motion under section 1054.9, Barnett added this request to those made in the motion and asserted the request was for category No. 2 materials under Steele.
In their informal response to the motion, the People asserted, "The arrest on July 10, 1986 was relative to the initial charges in this matter. The charges were dismissed." In his second brief, Barnett requested "documentation establishing these facts from prosecution and law enforcement agencies involved in the investigation and prosecution of the case." In their formal response to the motion, the People asserted that "[t]he short answer is that the entire discovery given over to petitioner at trial establishes these `facts.' Further, the dismissal of the charges against Burgess is in the court record, having occurred pursuant to Penal Code Section 1099 on May 9, 1988, the first day of trial."
The trial court denied the request "to the extent it requests information beyond *791 what has already been provided for and/or ordered herein."
Barnett contends the court's ruling was an abuser of discretion because he "could have impeached [Burgess, who testified against him,] with the fact that he had charges pending against him that were not disposed of until after he testified." Barnett contends the People's explanation for the disposition of the charges against Burgess "does not account for the narcotics charge."
The rap sheet for Burgess that was part of the original discovery appears to show that Burgess was arrested on July 10, 1986, for assault with a deadly weapon, robbery, and possession of a controlled substance. On July 14, 1986, a complaint was filed in the Oroville Justice Court charging Burgess with assault by means likely to produce great bodily injury and four counts of kidnapping. On August 11, 1986, an information was filed in the superior court charging Burgess with two counts of robbery, assault with a firearm, and four counts of kidnapping. On the first day of trial, the trial court granted the People's motion to dismiss the information against Burgess.
Barnett complains that the dismissal of the information "did not resolve the narcotics charge because the narcotics charge was not included in the complaint or information filed against Burgess." Thus, he implies, there must be other material in the possession of the prosecution and/or the relevant law enforcement authorities showing the disposition of the narcotics charge.
That Barnett was arrested for possession of a controlled substance does mean that a charge of possession of a controlled substance was ever filed against him. Indeed, it appears from the materials already in Barnett's possession (described above) that no such charge was ever filed.
Under these circumstances, we find no abuse of discretion in the trial court's denial of this discovery request.

XXII

"The Hooker Rape Victim"
In early September 2004, Barnett's attorneys apparently had a conversation with the district attorney and his chief investigator regarding Barnett's discovery motion. During that conversation, the investigator apparently referred to someone as "the hooker rape victim." That reference generated the following inquiry in a letter dated September 9, 2004: "Please provide any information or records, in any form, regarding the witness whom Mr. Koester referred to as `the hooker rape victim.' There were two witnesses who alleged that Mr. Barnett raped them: [M.G.] and [H.T.]. While we assume that Mr. Koester's comment referred to one of these two witnesses, we ask for any information or records indicating that any of the State's witnesses was a `hooker.'"
Having received no response to their inquiry, Barnett's attorney reiterated their request for information on the "hooker rape victim" in their October 2004 letter. In his initial brief on the motion under section 1054.9, Barnett added this request to those made in the motion and asserted the request was for category No. 2 materials under Steele.
In their informal response to the motion, the People asserted, "This comment made by [Koester] was in reference solely to the attire worn by [H.T.], a witness in the People's penalty phase case. The state has no information which connects [H.T.] with the crime of prostitution. A rap sheet for [H.T.] has been acquired and is included." In his second brief, Barnett requested "that Mr. Koester provide this information in a declaration under oath."
*792 In their formal response to the motion, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. This is not a proper discovery request but a request for the People to write a postconviction report for the petitioner, which is beyond the scope of Penal Code Section 1054.9 and Steele. Additionally there is no duty to prepare notes or a report at the request of a defendant of conversations (or observations) not presently reduced to writing. [Citation.] Nor are the People required to make a complete and detailed accounting to the petitioner of all investigative work on a case."
The trial court denied the request.
Barnett contends the trial court's ruling was an abuse of discretion because "[i]nformation that one of the State's witnesses was a prostitute was impeachment material that was not disclosed at the time of trial." The People do not offer any argument against this request that we have not already rejected.
To the extent Barnett seeks information about the particular witness to whom the investigator referred as "the hooker rape victim," the People's informal response provided Barnett everything to which he might have been entitled. The investigator identified the witness to whom he was referring, explained that his reference to her as a "hooker" was based on her attire, stated that the People had no information actually connecting her with the crime of prostitution, and provided Barnett with a copy of her rap sheet. As to this aspect of Barnett's request, there was no discovery left for the court to order.
Barnett's request, however, also sought "any information or records indicating that any of the State's witnesses was a `hooker.'" (Italics added.) Barnett contends he was entitled to such material "because evidence of a witness's criminal activity could have been used to impeach."
Even assuming there was evidence one or more of the prosecution's witnesses was a prostitute, the People had no constitutional duty to disclose that evidence to Barnett unless it was material. Because Barnett has failed to demonstrate the materiality of any such evidence, he has failed to show he was entitled to such evidence at time of trial. Accordingly, the trial court did not abuse its discretion in denying this request.

XXIII

Dave McGee's Propensity For Violence
Other comments the investigator apparently made during the conversation in early September 2004 about being threatened by one Dave McGee led Barnett's attorneys to recount an incident Barnett had told them about McGee in which McGee allegedly "climb[ed] on top of a police car and defecat[ed]." Based on these incidents, Barnett's attorneys requested "any information regarding Dave McGee's history of violence and disrespect for law enforcement." In his initial brief on the motion under section 1054.9, Barnett added this request to those made in the motion and asserted the request was for category No. 2 materials under Steele.
In their informal response to the motion, the People asserted, "The State has no information regarding the incident as described in the defendants [sic ] brief. Indeed, had the incident actually happened, it would be common knowledge within Butte County law enforcement as a legend which would endure the decades of time." In his second brief, Barnett requested "that the Court compel the prosecution to provide a declaration under oath to that effect, detailing its efforts to investigate the matter in the records of other prosecution and law enforcement agencies involved in the investigation and prosecution *793 of the case." In their formal response to the motion, the People asserted, "Nothing exists as to this request beyond that already disclosed to petitioner. This is not a proper discovery request but a request for the People to write a post-conviction report for the petitioner, which is beyond the scope of Penal Code Section 1054.9 and Steele. Additionally there is no duty to prepare notes or a report at the request of a defendant of conversations (or observations) not presently reduced to writing. [Citation.] Nor are the People required to make a complete and detailed accounting to the petitioner of all police investigative work on a case."
The trial court denied the request.
Barnett contends the trial court abused its discretion in denying this request because "McGee testified that Mr. Barnett was the aggressor in a fight between them, whereas Mr. Barnett testified that McGee was the aggressor." According to Barnett, "In a contest of credibility, evidence of McGee's reputation for violence would have been compelling evidence impeaching McGee and corroborating Mr. Barnett."
The People do not offer any argument against this request that we have not already rejected.
Even assuming evidence of McGee's reputation for violence would have been favorable to Barnett, he has failed to make any showing that such evidence would have been material. Thus, he has failed to show any abuse of discretion by the trial court in its denial of this request.

XXIV

Identification Of Redacted Documents
In his second brief on the motion under section 1054.9, Barnett added this final request: "[S]ometimes it is hard to tell if a document has been redacted. Mr. Barnett requests that the Court compel the prosecution to provide a declaration from someone with personal knowledge stating which documents provided in discovery are redacted and that none of the other documents have been redacted."
In their formal response to the motion, the People did not respond to this request.
The trial court denied the request.
Barnett contends this ruling was an abuse of discretion because "[t]here is no legitimate state interest in hiding redacted material, or concealing the fact that material has been redacted." The People respond that "Barnett has presented no case or other rule for this novel request.... Certainly nothing in section 1054.9 or in California's general discovery laws requires such a[n] undertaking by the prosecution." In reply, Barnett asserts that "[t]he [federal] Freedom of Information Act ... requires government agencies to indicate on the document where any deletions or redactions were made." He also cites a state court decision from Florida.
Barnett contends that information about which documents have been redacted "will enable [him] to ascertain whether there has been full compliance with the discovery order entered at the time of trial and with the discovery order entered on" his motion under section 1054.9. He does not explain how this is so, however. Knowing that something is missing from a document does not necessarily give you any basis for knowing what is missing.
In any event, under section 1054.9 Barnett is entitled to discovery of materials to which he would have been entitled at time of trialnothing more, nothing less. If part of a document falls within that category, then he is entitled to that part of the document, but not the rest. Just as he has no right to know exactly which documents the People have withheld from discovery because they are not materials to which he *794 would have been entitled at time of trial, Barnett has no right to know exactly what portions of the documents the People have produced were redacted because those portions are not materials to which Barnett would have been entitled at time of trial. Accordingly, the trial court did not abuse its discretion in denying this request.

DISPOSITION
The petition is granted in part and denied in part. Having served its purpose, the alternative writ is discharged.
Let a peremptory writ of mandate issue directing the respondent court to modify its discovery order by granting Barnett's requests for the following materials:
(1) "[a]ll original notes taken by any police officer relating to the interview of any witness to be called to testify against the defendant," including the 22 out-of-state officers identified by Barnett; and
(2) "documentation in any form of any person conveying information to law enforcement in Butte County, including BINTF, regarding Mr. Barnett, the case against him or the witnesses in his case," including "information about any person who conveyed information to law enforcement regarding `street talk' about the case, and any `street talk' to the effect that Mr. Barnett was innocent, was being set up and/or was framed."
I concur: SCOTLAND, P.J.
Concurring opinion of SIMS, J.
I concur in Justice Robie's thoughtful and thorough opinion. In my view, he has correctly construed Penal Code section 1054.9 (section 1054.9) in accordance with the intent of the Legislature.
I write separately to share my views on the current state of death penalty litigation and on the relationship of section 1054.9 to that litigation.
The typical modern death penalty case usually involves four trials.
The first trial determines whether the defendant is guilty of the offense. If the jury finds him guilty with special circumstances, the second trial determines the penalty: death or life without possibility of parole.
The third trial is the trial of the jurors who arrived at the decisions in the first two trials. The third trial is usually initiated by an investigator for the defendant, who locates trial jurors and gets one or more of them to supply an affidavit detailing what went on in the jury room. Then, the third trial examines the jurors' deliberations in minute detail in order to make sure that the jurors have not engaged in any "misconduct," such as telling other jurors about their own personal experiences in life. (See e.g., People v. Schmeck (2005) 37 Cal.4th 240, 292-294, 33 Cal. Rptr.3d 397, 118 P.3d 451; People v. San Nicolas (2004) 34 Cal.4th 614, 643, 651, 21 Cal.Rptr.3d 612,101 P.3d 509.)
If the conviction and death penalty survive the third trial, the groundwork has been laid for the fourth trial, which is the trial of the attorneys (both prosecutor and defense counsel) who participated in the original trial. This fourth trial ordinarily arises in habeas corpus proceedings. The Legislature has seen fit to aid everybody in this fourth trial with the enactment of section 1054.9, which, as Justice Robie's opinion spells out, allows a defendant to "discover," among other things, every scrap of paper currently possessed by the prosecution or law enforcement that was prepared by any law enforcement agency that had anything to do with any witness. In this trial, appellate attorneys spend hours in the quiet of their offices composing attacks on the decisions of trial counsel *795 made instantly in the heat and crush of trial.
One consequence of all these trials, and associated appeals and writ proceedings, is that there is an extraordinary delay between a defendant's commission of his crime and his execution. For example, the most recent execution in California was Clarence Ray Allen, executed on January 17, 2006, for killings committed in 1980 (by hit men he solicited from prison). (Doyle, Egelko, & Finz, Ailing Killer Executed at Age 76 (San Francisco Chronicle (Jan. 17, 2006) p. A-l); see also People v. Allen (1986) 42 Cal.3d 1222, 1241, 1243-1244, 232 Cal.Rptr. 849, 729 P.2d 115.) So Clarence Ray Allen was executed some 26 years after he had committed his crime.
One month earlier than Allen's execution, Stanley "Tookie" Williams was executed for murders committed in February and March 1979. (Finz, Fimrite & Fagan, Williams Executed (San Francisco Chronicle, (Dec. 13, 2005) p. A-l); see People v. Williams (1988) 44 Cal.3d 1127, 245 Cal. Rptr. 635, 751 P.2d 901.) Again, the period between commission of the crime and execution was 25 or 26 years.
In my view, section 1054.9 will further delay the final adjudication of death penalty cases. The statute provides yet another excuse for a defendant to litigate, and litigate, and litigate.
These delays between commission of the crime and punishment are the direct result of attempts to create perfect due process for those receiving the death penalty. Section 1054.9 is simply the most recent manifestation of such attempts. Of course, when the time lag between crime and punishment is more than a quarter of a century, all deterrent effect of the punishment is lost. The truth of the matter is that opponents of the death penalty have won.
This fixation with attempting to provide perfect justice [1] has emasculated the death penalty in California. This is in absolute and complete derogation of the will of the voters of California who have repeatedly approved the death penalty by initiatives since 1978.[2]
*796 In the present case, defendant and petitioner, Lee Max Barnett, committed his crimes, including a murder that involved the infliction of torture, 20 years ago on July 6, 1986. (People v. Barnett (1998) 17 Cal.4th 1044, 1069, 74 Cal.Rptr.2d 121, 954 P.2d 384.) He is just now getting the discovery described in Justice Robie's opinion. His case will be going on for a long, long time.
In its opinion affirming his death penalty sentence, our Supreme Court summarized evidence of defendant Barnett's background as follows:
"In addition to relying on the circumstances of the instant crimes, the prosecution presented evidence of defendant's prior felony convictions and evidence of his prior violent criminal activity, as follows:
"In 1965, defendant was being pursued in a vehicle when he injured a state trooper in New York by running him off the road. Defendant was convicted of second degree assault, transportation of a stolen vehicle across state lines, and felony attempted prisoner escape.
"In March of 1969, defendant robbed the clerk of a liquor store in New York at knife point. Prior to taking the money, defendant had proposed to the clerk that they split the proceeds. A week later, defendant robbed him again, this time claiming to have a gun in his coat. After his arrest, while the clerk was sitting near him in court, defendant repeatedly warned the clerk in a low voice to say he did not remember anything.
"In September of 1970, defendant was arrested for a series of robberies in the Calgary area. At the time of his arrest, defendant was a passenger in a truck and raised a loaded handgun up off the seat with his left hand. A second officer stopped defendant from using the gun. He was convicted of five counts of armed robbery.
"In December of 1971, defendant tried to rob the owner of a North Miami Beach restaurant at gunpoint. He was thwarted when the owner slammed the cash register drawer on his hand as he tried to grab the money. He fled and police pursued. During the pursuit, defendant backed his vehicle into a police officer, hitting him in the right leg. He also sideswiped a police car and ran into a fence. Defendant eventually was shot in the left leg after he pointed a gun at an officer.
"In April of 1972, defendant robbed the attendant of a Phoenix gas station at gunpoint. Prior to committing the robbery, defendant had tried unsuccessfully to get the attendant to set up a robbery and share the proceeds.
"In September of 1973, defendant, while in custody at a medical facility, resisted being transported back to jail. He broke away from officers and started smashing at the glass door of a fire extinguisher compartment. He had to be Maced before he could be handcuffed.
"On October 26, 1977, defendant raped 17-year-old Mae G. when they went for a *797 drive in his car. Defendant took her to an isolated location where he raped her, sodomized her, and forced her at knife point to perform oral sex.
"In November of 1979, defendant was convicted of assault on David Sinopoli and sentenced to prison in Massachusetts.
"In November of 1982, defendant met Helen T. in a bar in Albany, New York, and got her in his car on the pretext of sharing some marijuana. He took her to an isolated area and raped her.
"On January 10, 1987, defendant, while incarcerated in jail, used a razor blade to slash the arm of Arthur Jordan, an inmate in the next cell, as Jordan was leaning on the bars watching television. Defendant had accused the victim of having his buddy, the former resident of the cell, moved.
"On May 13, 1987, defendant caused a disturbance in the jail yard by refusing to wear his jumpsuit as required by jail rules. As he was being led back to his cell, he threw his fist towards the head of one of the officers. The fist did not connect because another officer grabbed defendant's arm with both hands.
"On May 24, 1988, defendant spit at three correctional officers, hitting two in the face, as he resisted being loaded into a transportation van. Once in the van, defendant kicked out one of the windows.
"On July 22, 1988, defendant tried to kick out the windows of the patrol car he was riding in. When an officer tried to grab him, he spit in his face." (People v. Barnett, supra, 17 Cal.4th 1044, 1080-1081, 74 Cal.Rptr.2d 121, 954 P.2d 384.)
If the day ever comes when we have afforded perfect due process to this model citizen, Lee Max Barnett, and he is executed, few will remember the circumstances of his crimes, which involve the torture and stabbing to death of Richard Eggett. Few will remember that, before stabbing Eggett to death, Barnett snagged Eggett in the back with a treble fish hook and yanked on it. (People v. Barnett, supra, 17 Cal.4th at p. 1073, 74 Cal.Rptr.2d 121, 954 P.2d 384.) I say "few" will remember because one group of people will doubtless remember: the family of Richard Eggett, who will have endured painful decades of living with Eggett's murder without closure.
Something really must be done about the current state of death penalty litigation, and it is not to provide defendants (who have had the death penalty imposed by a jury) with more post-conviction discovery.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] As relevant here, that statute provides as follows: "(a) Upon the prosecution of a postconviction writ of habeas corpus or a motion to vacate a judgment in a case in which a sentence of death or of life in prison without the possibility of parole has been imposed, and on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall, except as provided in subdivision (c) [relating to access to physical evidence for the purpose of examination], order that the defendant be provided reasonable access to any of the materials described in subdivision (b). [¶] (b) For purposes of this section, `discovery materials' means materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial." (§ 1054.9.)
[3] The Supreme Court has since denied both petitions. (In re Barnett (July 27, 2005, S096831) [den. by order]; In re Barnett (May 17, 2006, S120570) [den. by order].) Barnett's federal petition remains pending.
[4] Originally, there were 25 requests at issue, but in his replication, Barnett withdrew his objection to the denial of one of those requests.
[5] We will refer to these materials as category No. 1 materials.
[6] We will refer to these materials, respectively, as category No. 2 materials, category No. 3 materials, and category No. 4 materials.
[7] Barnett explained elsewhere that the six law enforcement agencies for whom these 22 officers worked had been involved in investigating Barnett's prior crimes that were used as aggravating factors in the penalty phase of his trial.
[8] There is reason to believe the court may not have intended to limit its ruling in this manner. The court's exclusion of the out-of-state officers from its ruling on Barnett's request for original notes occurred because the court referenced a particular page and line numberpage 29, line 1of one of Barnett's briefs. Had the court referenced line 21, instead of line 1, the out-of-state officers would have been encompassed in the ruling. There are two reasons to believe the trial court's reference to line 1, instead of line 21, was a mistake. First, the court's definition of "law enforcement authorities" in its ruling on "Point One" was broad enough to encompass the out-of-state officers because those officers appear to have investigated charged or uncharged crimes that were presented against Barnett in the guilt phase or as an aggravating factor in the penalty phase of the case. Second, immediately after the ruling at issue here, the trial court granted a request for (among other things) "all notes and memorandum of any kind, handwritten or typed ... relating to statements made by any witness the prosecution intended to call...." This request (discovery item No. 7) was broad enough to subsume Barnett's more specific request for "original notes" at issue here (discovery item No. 6), but the trial court did not exclude the out-of-state officers from the scope of this subsequent ruling.

Given that the court's ruling on discovery item No. 7 appears to require the People to provide Barnett access to all of the material that he is otherwise seeking under discovery item No. 6, we could decline to further consider Barnett's challenge to the partial denial of his request for original police notes. To provide clarity, howeverand because neither party has raised the point of whether discovery item No. 6 is subsumed in discovery item No. 7we choose to address and resolve the parties' dispute over discovery item No. 6.
[9] Here, it appears the discovery provided by the prosecution at time of trial was consecutively numbered. Accordingly, Barnett was able to identify by the missing page number documents that he once had but now did not. That may not always be the case, however.
[10] Indeed, earlier in his motion Barnett specifically asserted that "the prosecution failed to fully comply with the [discovery] order."
[11] The People use this argument as one of their responses to virtually every one of the discovery requests remaining at issue in this proceeding. Having rejected the argument here, we will not address it again.
[12] Barnett did not submit any declarations to support the unsworn statements in his motion, and thus there was technically no evidence to support the showing required by section 1054.9; however, the People forfeited any objection on this ground by not raising it in the trial court.
[13] The People use this argument as one of their responses to virtually every one of the discovery requests remaining at issue in this proceeding. Having rejected the argument here, we will not address it again.
[14] As we have noted, the February 1987 discovery order required the prosecution to disclose "[t]he criminal record of all witnesses who may be called to testify at the trial of this case." At the same time, however, the court denied Barnett's request for discovery of "all pending criminal charges against [those witnesses] anywhere in the State of California, all information regarding the current parole and/or probation status of such persons, and all arrests, criminal charges, ongoing criminal investigations, or actions pending anywhere in the State of California since the date of the alleged offense charged in the Information," except as to Barnett and his alleged coparticipant. Thus, the trial court apparently concluded the details specified in the second request were not part of the "criminal records" the court was ordering produced in response to the first request. This explains why Barnett has not claimed those details were subject to disclosure under Steele because they came within the scope of the February 1987 discovery order and instead is relying solely on Brady to justify his request for those details.
[15] At this point, we are concerned only with evidence a defendant seeks on the ground it was subject to the prosecution's constitutional duty to disclose exculpatory evidence under Brady. We express no opinion on what must be shown to obtain evidence that was subject to a statutory duty to provide discovery, such as the duty imposed on the prosecution by subdivision (e) of section 1054.1 to disclose "[a]ny exculpatory evidence." The reciprocal discovery statutes (§ 1054 et seq.) of which section 1054.1 is a part were not enacted until 1990, two years after Barnett's trial. Thus, those statutes do not govern what Barnett would have been entitled to at time of trial and therefore have no bearing on his section 1054.9 motion.
[16] We recognize that the Supreme Court in Steele directed the superior court to issue a discovery order under section 1054.9 for materials the defendant contended fell within the Brady duty of disclosure without expressly requiring the defendant to demonstrate materiality. Instead, the Supreme Court simply noted that "[i]f the defense had specifically requested the prosecution to provide all of petitioner's prison records in its possession," "the prosecution would have been obligated to provide them" "assuming the records were otherwise material." (In re Steele, supra, 32 Cal.4th at p. 702, 10 Cal.Rptr.3d 536, 85 P.3d 444, second italics added.) By this assertion, however, the court did recognize that materiality was an essential element in showing that the defendant would have been entitled at time of trial to the documents now sought, and since Steele elsewhere makes clear that the defendant bears the burden of making this showing, it follows that the showing of materiality must be made by the defendant before he is entitled to a discovery order under section 1054.9.
[17] Again, at this point we are concerned only with materials to which a defendant claims entitlement under the constitutional duty of disclosure, and not with materials to which a defendant may claim entitlement under a discovery order issued at time of trial or a statutory duty of disclosure.
[18] We note that the defendant in In re Sassounian, supra, 9 Cal.4th at page 535, 37 Cal.Rptr.2d 446, 887 P.2d 527 made the same mistake over a decade ago in pursuing habeas relief based on an alleged Brady violation. (See id. at p. 550, fn. 14, 37 Cal.Rptr.2d 446, 887 P.2d 527.) Thus, there can be little (if any) excuse for Barnett's failure to do so here.
[19] We note that there is no explicit authority in section 1054.9 or Steele for the declaration requirement the trial court imposed here. We have no occasion to decide, however, whether the imposition of this requirement was improper, because the People did not seek review of the trial court's discovery order by filing a petition for writ of mandate, nor have they raised any issue regarding the validity of this requirement in response to Barnett's petition.
[20] The People use this argument as one of their responses to virtually every one of the discovery requests remaining at issue in this proceeding. Having rejected the argument here, we will not address it again.
[21] Barnett notes that "[r]ecords regarding drug use and abuse" fall within the scope of one of his earlier requests, which we have addressedand rejectedalready. He also notes that the trial court granted him access to the prison records of the People's witnesses in response to another request. Accordingly, in considering the present request, welike Barnettlimit ourselves to probation, juvenile, and mental health records.
[22] In one of his habeas corpus petitions, Barnett alleged that while C.L. obtained a certificate of rehabilitation from the superior court in 1984, the Governor refused to pardon him and therefore his civil rights were not restored. (See § 4852.17 [civil rights restored by the granting of "a full and unconditional pardon by the Governor, based upon a certificate of rehabilitation"].)
[23] Barnett asks us to infer that the People did "conduct[] juror investigations" from the fact that "[i]n response to other discovery requests, [the People were] quick to say that the requested materials did not exist," "[y]et as to juror investigations, [they] made no such denial." That criminal records for Jurors C.L., L.F., and potentially others may exist (which may be inferred from the People's failure to assert otherwise in response to Barnett's request for such records) does not mean the People conducted investigations of those jurors at time of trial and thus availed themselves of those records. Accordingly, the inference Barnett asks us to draw is not a reasonable one.
[24] Specifically, Barnett asserted that the materials fell within the scope of 35 specific discovery requests in the discovery order from trial, 34 of which the trial court granted.
[25] Because discovery at the time of Barnett's trial was governed by California case law, it is appropriate for us to consider that case law in determining whether Barnett would have been entitled to these materials if he had asked for them at that time.
[26] Barnett no longer contends this request was for materials that fell within the scope of the February 1987 discovery order.
[27] The People apparently obtained these documents from BINTF pursuant to a subpoena issued in March 2005.
[1] There is, of course, no such thing possible in the affairs of men and women.
[2] The last time the voters approved of the death penalty was in the March 7, 2000, Primary Election, when the voters approved amendments to the death penalty statute (Pen.Code, § 190.2) in Proposition 18 and (initiative measure) Proposition 21. (Historical and Statutory Notes, 47A West's Ann. Pen. Code (2006 Supp.) foll. § 190.2, p. 127; People v. Shabazz (2006) 38 Cal.4th 55, 65, 40 Cal.Rptr.3d 750, 130 P.3d 519 [stating voters approved Proposition 21].) Proposition 18 provided special circumstances warranting the death penalty for intentional murder committed in connection with kidnapping or arson or committed by "means of" (rather than "while") lying in wait. (Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 18, p. 117.) Proposition 21, section 11, added gangrelated murder as a special circumstance warranting the death penalty. (Historical and Statutory Notes, 47A West's Ann. Pen. Code (2006 Supp.) foll. § 190.2, p. 127; Notes, Deering's Ann.Code Pen.Code (2006 Supp.) foll. § 190.2, p. 76 [quoting Proposition 21]; Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, p. 121 et seq.)

Before that, the voters approved the death penalty in the March 26, 1996, Primary Election, when they approved Propositions 195 and 196, expanding the list of special circumstances warranting the death penalty.' (Historical and Statutory Notes, 47A West's Ann. Pen.Code (1999 ed.) foll. § 190.2, pp. 207-208; Ballot Pamp., Primary Elec. (Mar. 26, 1996) text of Props. 195 & 196, pp. 56, 58.)
Before that, the voters at the June 5, 1990, Primary Election approved Proposition 114, conforming § 190.2's special circumstance for murder of peace officer to legislative reclassification of peace officers. (Yoshisato v. Superior Court (1992) 2 Cal.4th 978, 983, 9 Cal.Rptr.2d 102, 831 P.2d 327; Historical and Statutory Notes, 47A West's Ann. Pen. Code (1999 ed.) foll. § 190.2, p. 207; Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 114, p. 29.) Also at the June 5, 1990, Primary Election, voters approved initiative measure Proposition 115, which among other things restricted attorney voir dire in all criminal cases, including death penalty cases. (People v. Ramos (2004) 34 Cal.4th 494, 511, 21 Cal.Rptr.3d 575, 101 P.3d 478; Historical and Statutory Notes, 47A West's Ann. Pen. Code (1999 ed.) foll. § 190.2, p. 207; Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, p. 33.)
Before that, the voters at the General Election on November 7, 1978, adopted the death penalty initiative approving Penal Code section 190.2. (People v. Hernandez (2003) 30 Cal.4th 835, 865-866, 134 Cal.Rptr.2d 602, 69 P.3d 446; People v. Teron (1979) 23 Cal.3d 103, 123-125, 151 Cal.Rptr. 633, 588 P.2d 773, dissenting opinion of Clark, J., reciting history of death penalty in California.)